BOOKER V. STATE

(comment: 1)(comment: 2)

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-00-408-CR

DUWAN A. BOOKER APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY

------------

OPINION
 ON REHEARING

------------

After reconsidering our prior opinion on appellant’s motion for rehearing, we grant the motion, withdraw our July 11, 2002 opinion, and substitute the following in its place. 

I.  Introduction

Appellant Duwan A. Booker appeals his conviction for aggravated robbery with a deadly weapon.  In two issues, he contends that the trial court erred in admitting evidence of two extraneous offenses during the guilt/innocence phase of the trial.  We reverse and remand for a new trial.

II.  
Factual Background

On December 16, 1998, after taking her boyfriend to work at about 4:00 a.m., Elsa Lopez returned to the King’s Mill apartments in Fort Worth where she lived.  When she got out of her car, she saw a man on the other side of the parking lot, who asked her for directions to Berry Street.  She gave him directions and noticed that he wore dark green overalls and a stocking hat.  As she continued walking, the man ran up behind her, put his arm around her neck, and demanded her purse.  When she refused, the man put a cold, sharp knife to her neck and threatened to kill her if she did not give him her purse.  When Lopez screamed, the man put his hand on her mouth.  She then turned around and saw the man close to her face.  As she continued to fight, the man took her purse, and she fell to the ground.  She saw him run away past the apartment office and swimming pool.  The apartments were well lit, and there was a street light nearby. 

Lopez called the police and Fort Worth Police Officer Dale Connor arrived at 5:21 a.m. to investigate.  Although still upset, Lopez was able to describe the robbery at knife-point by a dark-complected, young man about “five foot eight” in height and weighing 130 pounds.  Officer Connor observed that Lopez’s neck was red, consistent with someone having grabbed her tightly around the neck. 

On January 7, 1999, Melissa Griffin found two purses in her backyard at 3737 Misty Meadow in Fort Worth, a location about five blocks from the King's Mill apartments.  After finding Lopez’s driver’s license in one of the purses, Griffin called Lopez.  Lopez went to Griffin’s house about 6:00 p.m. that evening to retrieve her purse.  In explaining to Griffin what had happened to her, Lopez described the robber as a medium-sized, black male wearing a tight-fitting, green cap.  Griffin told her that she had seen some guys playing basketball next door earlier that day, and one of them fit that description.  While Lopez was still there, Griffin went upstairs and looked into the backyard next door, and she again saw the person fitting the description given by Lopez.   On January 8, 1999, Fort Worth Police Detective Bobby Pate contacted Lopez and showed her a photo spread that did not include appellant’s photograph.  Lopez stated that the person who robbed her was not in the photo spread.  After learning that Lopez’s purse had been recovered and that appellant was a possible suspect, Pate showed Lopez a photo spread that included appellant’s photograph on January 21, 1999.  Confidently and almost immediately, Lopez identified appellant’s photograph as that of the person who had robbed her. 

Lopez also identified appellant at trial as the person who had robbed her on December 16, 1998.  Likewise, Griffin identified appellant at trial as the person she had seen in the backyard next door on January 7, 1999, matching the description Lopez had given her. 

Over appellant’s objections, the State elicited testimony at trial concerning two extraneous offenses allegedly committed by appellant; the victims were Maralee Linstead Kilts (Linstead) and Laura Davis (Davis).  First, Linstead testified that on January 4, 1999, when she got in her car at the King’s Mill apartments, the same apartments as Lopez's, to leave for work about 4:15 a.m., her “car door came back open,” and a man came up from behind, said that he had a gun, and told her to do what he said or he would kill her.  The man was of medium height and wore a scarf covering his head.  The man got in the passenger’s seat and ordered Linstead to drive to a park a few blocks away.  As she drove, the man repeatedly struck her in the face with his fists while screaming, cursing, and threatening to kill her.  At the park, the man sexually assaulted her in the back seat.  He then took her purse, threatened her again, and told her not to move as he got out of the car and left.  About five minutes later, Linstead went to a truck in a nearby driveway where she asked someone to call 911.  Linstead never got a good look at the attacker’s face because it was covered the entire time. 

Other State’s witnesses testified about Linstead's sexual assault.  Detective Cheryl Johnson testified the other purse recovered from Griffin's residence belonged to Linstead.  Deborah McNairn, a sexual assault examiner at John Peter Smith Hospital, testified concerning the sexual assault examination that she performed on Linstead at John Peter Smith Hospital on January 4, 1999.  The examination included looking for trauma and taking various specimens for testing.  McNairn also testified concerning Linstead’s statement to her of what had happened during the sexual assault. 

Lisa Sweetland, a forensic serologist at Southwestern Institute of Forensics Science, testified concerning her testing of vaginal swabs and other specimens from the Linstead sexual assault kit.  Sweetland also described her collection of blood samples from appellant pursuant to a warrant and the making of a bloodstain for further testing such as DNA. 

Aliece Watts, senior analyst over the DNA section of the Fort Worth Police Forensic Science Laboratory, testified concerning the nature and development of DNA testing as well as her tests of the samples in the Linstead case.  After testing the vaginal swabs from the sexual assault kit as well as bloodstains from appellant and the man whom Linstead had been dating, Watts determined that the DNA of the major contributor matched that of appellant.  She testified that the probability of finding another person besides appellant who had the same DNA was one in 39,500 African-Americans, 2.8 million Caucasians, or 855,000 Hispanics. 

Evidence of the second extraneous offense involving Laura Davis was first introduced by Officer Richard Simmons's testimony.  Simmons testified that on January 16 and 17, 1999, he and other officers conducted surveillance on appellant’s house at 3733 Misty Meadow, next door to Griffin's house.  The officers had been conducting nightly surveillance from a van for about a week and a half because of Griffin’s report of having recovered stolen property from her backyard as well as to investigate the December 16, 1998 robbery and the January 4, 1999 aggravated sexual assault and aggravated kidnapping.  Earlier in the trial, Griffin had identified appellant as the person she saw at 3733 Misty Meadow on January 7, 1999 matching the description Lopez gave her.  

Simmons testified that the officers observed a young man, later identified as appellant, leave 3733 Misty Meadow at about 1:00 a.m. on January 17, 1999.  Appellant walked through the neighborhood and the King’s Mill apartments and then to the Polo Club apartments where, during a five-hour period, the officers observed appellant on four occasions attempt to approach lone females.  About 6:00 a.m., Simmons saw appellant driving a minivan erratically while beating a female passenger about the face, neck, and shoulders and pulling her hair while she was honking the horn.  When the van came to a stop, appellant fought the officers, but they were able to arrest him.  They then found a baby in the van’s backseat. 

Just before daylight on January 17, 1999, Officer Patrick Blauser, who also testified, watched appellant at the Polo Club apartments from the roof of a grocery store as appellant moved in and out of the buildings and breezeways and ran toward and attempted to waive down two different vehicles.  As daylight approached,  Blauser heard a woman screaming.  Blauser notified the other officers by radio, and after discussing whether to send in the marked police cars, they decided to “send in everybody.”  Within a minute, the officers stopped the van.  

Officer Simmons interviewed the victim, Laura Davis.  Although she was still upset, Davis explained how she had walked to her van and placed the child into the car seat through the sliding door.  According to Davis, as she was attempting to start the van, appellant knocked on her window, stated that his car had broken down, and asked for a ride to his grandmother’s house where he had left his children overnight.  When Davis repeatedly declined, appellant opened the door and struck her with both fists, pushing her out of the driver’s seat onto the floorboard.  When appellant got in and started to drive, Davis told him about the baby in the back, but he said he “didn’t care.”  Davis offered him money, and he ordered her to get it.  In addition to repeatedly striking Davis, appellant threatened to kill Davis and told her that he had a gun.  When a police car met the van head on, appellant again threatened to kill Davis if she said anything.  

On January 18, 1999, appellant gave a written statement to Detective John McCaskill about the incident with Davis.  Appellant stated he decided to take a walk around the neighborhood about 1:30 in the morning, and at the King’s Mill apartments he saw what he thought was an undercover police officer and then saw a big white dog.  Appellant explained that because of his fear of dogs he walked to the Polo Club apartments where he attempted to get a ride from a man and later tapped on a van window and asked a lady for a ride to his house.  Appellant continued, as follows: 

She said she was going the opposite way and I figured that it was my last chance of getting home at this time in the morning.  I knew she didn’t want to be bothered because I was a stranger.  On the other hand, me being so scared of dogs, I could not take no for an answer, so I opened the door and slid on the passenger’s side.  She was screaming like I was going to hurt her, and I was telling her I wasn’t going to hurt her.  She was hitting me in the arm, trying to push me out of the van and I was trying to push her, but I actually hit her in the face twice.  At that time I regretted it and I wanted to get out and apologize.  I was already driving when she was hitting me.  I was driving towards the gate.  I saw about five or six different police cars. . . .

Dr. Robert C. Benjamin, a molecular biologist, testified for the defense concerning the DNA analysis in the Linstead sexual assault.  Benjamin testified to difficulties in applying statistics when there is a match to a mixture as if the mixture were only one person’s profile.  Benjamin disagreed with the State’s testimony concerning the 39,000 black people to one probability of the sample being appellant’s in the extraneous offense involving Linstead and suggested instead a probability of thirty to one.

The defense also called appellant’s mother Mary Bailey and other alibi witnesses.  Bailey testified that during the middle of December of 1998, including December 16, the night of the Lopez aggravated robbery, she got up about three times a night to check on her kids and the house and that she had no recollection of appellant being out of the house during that time.  Bailey further testified that appellant stayed in Bedford with his cousin after a new years’ eve party in 1999 and that she picked him up on January 5 - the day after the Linstead aggravated sexual assault and aggravated kidnapping in Fort Worth.  Appellant’s brother William Lee Booker testified that he never noticed appellant missing when he woke up in December of 1998 and that he remembered his mother picking appellant up on January 5.  Appellant’s cousin Anthony Starks testified that he stayed with appellant from December 26 until December 31 and that appellant stayed at his house in Bedford from December 31 until January 5, including the early morning hours of January 4
.  

The trial court included the following limiting instruction in the jury charge:

You are instructed that if there is any testimony before you in this case regarding [appellant’s] having committed offenses other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that [appellant] committed such other offenses, if any were committed, and even then 
you may only consider the same in determining the identity of [appellant] in connection with the offense, if any, alleged against him in the indictment in this case, and for no other purpose
. [Emphasis added.]

III.  Preservation of Error

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion.  
Tex. R. App. P.
 33.1(a)(1); 
Mosley v. State,
 983 S.W.2d 249, 265 (Tex. Crim. App. 1998) (op. on reh’g), 
cert. denied, 
526 U.S. 1070 (1999).
  
Further, the trial court must have ruled on the request, objection, or motion, expressly or implicitly, or refused to rule, and the complaining party objected to the refusal.  
Tex. R. App. P.
 33.1(a)(2); 
Taylor v. State
, 939 S.W.2d 148, 155 (Tex. Crim. App. 1996).  

In this case, in response to appellant’s request, the State filed a pretrial notice of its intention to introduce evidence of extraneous offenses, including the January 4, 1999 Linstead aggravated sexual assault and aggravated kidnapping and the January 18, 1999 Davis kidnapping.  At trial, following the cross-examination of Lopez and after a hearing outside the presence of the jury, the following transpired:

THE COURT:  Well, under 404(b) it seems as if identity was brought into question.  As I read Siqueiros and 404(b), once the Defense questions the witness concerning identity, the State would be allowed to bring in extraneouses (sic).  The identity was made an issue by the Defense. 

The Court is going to find that there is a significant relationship that exists between the extraneous offenses in question and this offense that--the offense in question occurred at 5:15 a.m. on the 16th of December at the King’s Mills apartment.  The second--the first extraneous took place at 5:59 a.m. on January the 4th. And the third one took place at 4:47 a.m.

Even though they were different crimes, the offense in question is aggravated robbery, the other two extraneous offenses were aggravated kidnapping and aggravated assault, that they all are similar and that they all took place in the same similar location at approximately the same time.  And since the Defense did bring identity into question, the Court is going to rule that the State will be allowed to question the officer concerning the extraneous offenses.        

[DEFENSE COUNSEL]:  Judge, to protect my record, I need to go ahead and make my formal objections.  It would be a Montgomery type objection.  Under Rule 404(b) we would argue that the similarities are not great enough to make those relevant under 404(b), and they should stay excluded.  Furthermore, we would argue that simply under 401 they aren’t relevant, and under Rule 403 we would urge the Court to find that any probative value these extraneous offenses are substantially outweighed by prejudice.

In addition, with regard to the rape case, again we would urge the Court to find that--well, that will just be covered by the same objection, any probative value would be outweighed by any prejudice.

THE COURT:  Very well.

[DEFENSE COUNSEL]:  And for my record, do I understand that each one of my objections has been overruled?

THE COURT:  That’s correct.  

[DEFENSE COUNSEL]:  And when the State goes into those cases, may I have a running objection, then, that speaks to the objections I just made.

THE COURT:  Yes.

[DEFENSE COUNSEL]:  With the understanding that those are overruled continuously?

THE COURT:  Yes.  All right.

On appeal, appellant contends that the trial court erred in admitting the extraneous offense evidence.  That is, appellant first contends that each  extraneous offense was too generic to be relevant on the issue of identity and was inadmissible under rules 401 and 404(b).  
Tex. R. Evid.
 401, 404(b).  Second, appellant contends that to the extent the evidence of the extraneous offenses had any relevance, it was inadmissible under rule 403 because its probative value was substantially outweighed by the danger of unfair prejudice.  
Tex. R. Evid.
 403.  Thus, we conclude that Appellant preserved his objections to the admission of evidence of the two extraneous offenses in question.  
See
 
Tex. R. App. P.
 33.1(a)(1)-(2).    

IV.  Relevance under Rules 401 and 404(b)

Rule 401 defines “relevant evidence” as  “evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.”  
Tex. R. Evid.
 401.  Rule 404(b) provides, in part:  “Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.” 
 Tex. R. Evid. 
404(b).  Rule 404(b) embodies the established principle that a defendant is not to be tried for collateral crimes or for generally being a criminal.  
Nobles v. State, 
843 S.W.2d 503, 514 (Tex. Crim. App. 1992).  Therefore, an extraneous offense must be shown to be relevant apart from character conformity before it may be admitted into evidence.  
Alba v. State, 
905 S.W.2d 581, 585 (Tex. Crim. App. 1995), 
cert. denied
, 516 U.S. 1077 (1996).  It is the trial court’s task to determine whether extraneous offense evidence is relevant to a purpose other than the propensity of the defendant to commit crimes or other bad acts.  
Ransom v. State, 
920 S.W.2d 288, 300 (Tex. Crim. App.)(op. on reh’g), 
cert. denied, 
519 U.S. 1030 (1996).  The trial court’s ruling is entitled to deference and will be reversed only for abuse of discretion.  
Id.

In this case, the trial court admitted the extraneous offense evidence after  appellant's cross-examination of Lopez made identity a disputed issue.  
See Siqueiros v. State, 
685 S.W.2d 68, 71 (Tex. Crim. App. 1985) (recognizing that cross-examination of the State’s identifying witnesses can raise the issue of identity).  Identity is an “elemental fact” with relevance apart from character conformity.  
Montgomery v. State
, 810 S.W.2d 372, 387 (Tex. Crim. App. 1991) (op. on reh'g).   

Appellant did not object to the trial court’s determination that identity was a disputed issue.  On appeal, i
n discussing the probativeness versus prejudice balancing under rule 403, appellant argues that his cross-examination of Lopez did not “seriously” undermine or impeach her identification.  However, when appellant’s witnesses raised the defense of alibi, it is clear that identity became a disputed issue.  
See
 
Jones v. State, 
587 S.W.2d 115, 120 (Tex. Crim. App. [Panel Op.] 1978) (op. on reh'g). 

Raising the issue of identity does not automatically render extraneous offenses admissible, however.  
Lane v. State, 
933 S.W.2d 504, 519 (Tex. Crim. App. 1996).  “When an extraneous offense is offered to prove identity, the common characteristics or the device used in each offense must be so 
unusual and distinctive
 as to be like a 'signature'.”  
Taylor v. State
, 920 S.W.2d 319, 322 (Tex. Crim. App.) (emphasis added), 
cert. denied
, 519 U.S. 951 (1996).  That is, “to be admissible to show identity, an extraneous offense must be so similar to the charged offense as to
 mark
 the offenses as the defendant’s handiwork.”  
 Johnson v. State, 
68 S.W.3d 644, 650-51 (Tex. Crim. App. 2002) (emphasis added).  In determining similarity of the offenses for the purpose of establishing identity, appellate courts should take into account both the specific characteristics of the various offenses and the time interval between them.  
Id. 
at 651. 

The State argues that the extraneous offenses were sufficiently similar to the charged offense to show appellant’s “signature” and to be admissible to show identity based on the following:  (1) 
the time of day 
the offenses occurred was between 4:00 a.m. and 6:00 a.m.; (2) the offenses were committed within 
the same compact geographic area
 of the King’s Mill and Polo Club apartments; (3) the offenses occurred within a 
relatively short time period
—December 18, 1998, January 4, and January 17, 1999; (4) appellant 
preyed only upon lone females
, including the kidnapping of Davis where he was unaware of the child’s presence until he entered the minivan; (5) he 
took purses
 from Lopez and Linstead and indicated his intent to take Davis’s purse; (6) he 
threatened to kill
 Lopez, Linstead, and Davis; (7) he 
threatened to use some kind of weapon, 
using a knife on Lopez and threatening to use a gun on Linstead and Davis; (8) he 
attacked each victim with his hands, 
grabbing Lopez around the neck and leaving red marks and repeatedly hitting Linstead and Davis in the face; (9) he 
readily escalated his violence when the victims
 
resisted
 handing over their purses; and (10) he 
took furtive and predatory actions
, which the State describes as “cowardly,”
 
to catch lone female victims in vulnerable positions by acting as if he only wanted Lopez to give him directions, by surreptitiously catching Linstead off-guard and opening the car door she was trying to close, and by appearing at the side of Davis’s minivan and saying that he merely needed a ride to his grandmother’s home.

Appellant argues that the three offenses are not “signature” offenses but rather are generic and fungible with violent crimes generally.  Specifically, he  argues that (1) there is nothing unique about using or threatening to use a weapon; (2) there is nothing unique about making threats to kill; (3) nothing suggested the McCart/Alta Mesa area where the two apartment complexes are located was crime-free so as to make these offenses particularly singular and noteworthy; (4) the offenses were not of the same class or character in that the charged offense was a “hit-and-run aggravated robbery” while one of the extraneous offenses was a “car-jacking, aggravated robbery, and aggravated sexual assault” and the other was a “car-jacking of a woman and her baby”;  (5) a knife was used in the charged offense but not in the other two; (6) the charged offense did not involve a car while in the other two the perpetrator climbed into a car to remove the victim to another location; and (7) the fact that two detectives initially suspected a person named Thomas Hunter showed the generic character of the offenses.          

Among the cases upholding admission of evidence of extraneous offenses to prove identity is 
Walker v. State
, an aggravated rape case, which held six extraneous offenses to be sufficiently similar based on the following:

All the transactions took place at night, in the same area, within a period of one month.  In each case appellant was alone and carried a small gun.  The victims were tied in a similar manner, and robbery preceded rape in the four instances in which the victim was raped. Appellant took all coins but pennies from the victims who had coins.  

588 S.W.2d 920, 924 (Tex. Crim. App. [Panel Op.] 1979)
.       

Lane,
 a capital murder case, also upheld the admission of an extraneous murder as relevant to the issue of identity although the offenses occurred a decade apart in different states based on the similarity of the mode of committing and the circumstances surrounding the offenses.  933 S.W.2d at 519.  Those similarities included a similar victim profile of a single female young child of the approximate same age who was an unknown stranger; an abduction in a public area near the victim’s home with the victim physically relocated; the defendant having a “nexus” to the location of abduction; the victim being physically assaulted, sexually assaulted, and murdered; the victim’s body being “dumped”; the defendant committing the offense with a co-actor; the defendant being involved with the “search”; and the defendant claiming the victim’s underwear as a “trophy.”  
Id
. 
at 517.      

Harvey v. State
, an aggravated robbery case, upheld the admission of evidence of two extraneous offenses based on the following similarities: 

(1) all three offenses were car burglaries that turned into robberies when the victims interrupted appellant and Dorsey, (2) all three robberies were committed at gunpoint, ([3]) the defendant was aided by a confederate, (4) the offenses occurred within the space of an hour, (5) the offenses were committed in the same residential area, and (6) appellant and Dorsey used the same procedure in each offense (Dorsey drove, appellant or Dorsey burglarized the cars, and appellant handled the shotgun and the victims).   

3 S.W.3d 170, 176 (Tex. App.—Houston [14
th
 Dist.] 1999, pet. ref’d)
.
  

Recently, 
Johnson,
 a capital murder case, upheld the admission of evidence of extraneous robbery offenses based on the offenses each having been committed within a few hours of each other, directed at lone women, and involving the murder victim’s car.  68 S.W.3d at 651.
  
 

Among the cases holding that an extraneous offense lacks sufficient similarity to permit its admission on the issue of identity is 
Collazo v. State
, a sexual abuse case, where the similarities were that they each involved sexual assaults on adult women as they were returning to their automobiles in public places.  623 S.W.2d 647, 649 (Tex. Crim. App. [Panel Op.] 1981)
.  Likewise, 
Bishop v. State
, an aggravated sexual assault and burglary of a habitation case, held that testimony elicited from the defendant’s ex-wife concerning the defendant’s sexual proclivities and practices was improperly admitted because the testimony did “not provide evidence of actions so unusual and distinctive and so nearly identical to the charged offense as to amount to a ‘signature.’”  869 S.W.2d 342, 346 (Tex. Crim. App. 1993).
(footnote: 1)     

More recently, in 
Avila v. State
, a sexual assault case, the appellate court held that the trial court erred in admitting evidence of an extraneous offense on the issue of identity.  18 S.W.3d 736, 741 (Tex. App.—San Antonio 2000, no pet.)
.
  The court concluded
:

[T]here is nothing in this case that would act as the “signature” of the perpetrator and affirmatively link the charged offense to the extraneous offense. Although the two offenses share some similarities, we find those similarities are not substantial enough to warrant the admissibility of the extraneous conduct testimony.  Both rapes occurred within the city limits of Crystal City during the early morning hours while both victims were sleeping.  In each case, the assailant entered the premises without the consent of the victim and raped each victim in a common sexual position.  None of these similarities would mark both offenses as the “handiwork of the accused.”

Id.
  
Avila
 further relied on the following language from 
Ford v. State
:  “What must be shown to make the evidence of extraneous crime admissible is something that sets it apart from its class or type of crime in general, and marks it distinctively in the same manner as the principal crime.”  484 S.W.2d 727, 730 (Tex. Crim. App. 1972)
.            

In this case, in addition to the similarities between the charged offense and the two extraneous offenses set out above as outlined by the State, we note that appellant committed each offense after approaching the victims on foot at an apartment parking lot or sidewalk.  Two of the offenses took place at the same apartment complex.  Moreover, the purses of Lopez, the victim in the charged offense, and Linstead, the aggravated sexual assault and aggravated kidnapping victim, were both found by Griffin in her backyard at 3737 Misty Meadow, next door to appellant’s residence at 3733 Misty Meadow.  Appellant argues that there were a number of differences in the offenses, although all the offenses were violent.  Moreover, as appellant points out, a number of the similarities such as the threats to kill and to use a weapon are generic with violent crimes generally.  Nevertheless, the particular times of commission of the offenses at the same geographic location against lone females within a one-month period are more specific similarities, and, most significantly, the act of disposing of the purses of Lopez and Linstead at the same location marks both offenses as having been committed by the same person.

While the later kidnapping of Davis and her child presents a closer issue, appellant committed this offense by approaching on foot after having earlier walked to the apartments from his residence at 3733 Misty Meadow.  Similarly,  he committed and fled from the robbery of Lopez on foot, and he disposed of Lopez’s and Linstead’s purses in the backyard at 3737 Misty Meadow, next door to his residence.  Significantly, appellant committed the aggravated sexual assault of Linstead at a park near his residence, and it is a reasonable inference that when he left on foot he went home.   Appellant’s use of his place of residence as his “base” from and to which he would walk in committing violent crimes is, therefore, a fact marking each of the offenses as his particular handiwork.   

We conclude that there were sufficient similarities between the charged offense and the offenses against Linstead and Davis to uphold the trial court’s determination that the evidence was relevant under rules 401 and 404(b).  
Tex. R. Evid.
 401, 404(b).  We do so by reason of the similarities of the offenses as well as the deference required:  “appellate courts uphold the trial court’s ruling on appeal absent an ‘abuse of discretion.’  That is to say, as long as the trial court’s ruling was at least within the zone of reasonable disagreement, the appellate court will not intercede.”  
Montgomery
, 810 S.W.2d at 391.     

V.  Balancing under Rule 403

As discussed above, appellant preserved his objection under rule 403 that any probative value of the extraneous offenses was substantially outweighed by prejudice.  Rule 403 states in part that “[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.”  
Tex. R. Evid.
 403.

Rule 403 favors admissibility of relevant evidence, and the presumption is that relevant evidence will be more probative than prejudicial.  
Montgomery,  
810 S.W.2d at 389.  
Santellan v. State
 restated the factors discussed in 
Montgomery 
that should go into the balancing test as follows:

(1) how compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable--a factor which is related to the strength of the evidence presented by the proponent to show the defendant in fact committed the extraneous offense;     

(2) the potential the other offense evidence has to impress the jury “in some irrational but nevertheless indelible way”;

(3) the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the indicted offense; 

(4) the force of the proponent’s need for this evidence to prove a fact of consequence, i.e., does the proponent have other probative evidence available to him to help establish this fact, and is this fact related to an issue in dispute.  

939 S.W.2d 155, 169 (Tex. Crim. App. 1997) (footnote omitted).

An appellate court should afford deference to a trial court's rule 403 balancing determination and should reverse a trial court “rarely and only after a clear abuse of discretion.”  
Montgomery, 
810 S.W.2d at 392.  The trial court’s ruling must be upheld so long as it is within the “zone of reasonable disagreement.”  
Wheeler v. State
, 67 S.W.3d 879, 888 (Tex. Crim. App. 2002) (citing 
Montgomery
, 810 S.W.2d at 391).   

Montgomery
 discussed the appellate court’s review of a rule 403 balancing determination as follows:  

But reviewing the trial court’s judgment for abuse of discretion requires more of an appellate court than deciding that the trial judge did in fact conduct the required balancing and did not simply rule arbitrarily or capriciously.  The appellate court must measure the trial court’s ruling against the relevant criteria by which a Rule 403 decision is to be made.  .  .  .

Therefore we hold that where relevant criteria, viewed as objectively as possible, lead to the conclusion that the danger of unfair prejudice substantially outweighed the probative value of the proffered evidence, the appellate court should declare that the trial court erred in failing to exclude it.  Relevant criteria gleaned from the authorities include, 
inter alia
, that the ultimate issue was not seriously contested by the opponent; that the State had other convincing evidence to establish the ultimate issue to which the extraneous misconduct was relevant; that the probative value of the misconduct evidence was not, either alone or in combination with other evidence, particularly compelling; that the misconduct was of such a nature that a jury instruction to disregard it for any but its proffered purpose would not likely have been efficacious.  Accordingly, 
when the record reveals one or more such relevant criteria reasonably conducing to a risk that the probative value of the tendered evidence is substantially outweighed by unfair prejudice, then an appellate court should conclude that the trial court acted irrationally in failing to exclude it, and thus abused its discretion.

Montgomery
, 810 S.W.2d at 392-93 (emphasis added).

 Applying the factors set out in 
Montgomery
, we first recognize that the extraneous offense evidence has an “inherent probativeness” by reason of the similarity of the extraneous offenses to the charged offense, as discussed above.  
See
 
id. 
at 389-90.  The extensive evidence that appellant committed the extraneous offenses, including the DNA testimony and eyewitness testimony from police officers, is compelling.  The probative value of the extraneous offense evidence was somewhat lessened, however, by differences, including the fact that the charged offense involved no kidnapping to another place or sexual assault and the fact that no knife was used in the commission of the two extraneous offenses.  However, in both of the extraneous offenses, appellant threatened the women by telling them he would use a weapon.

Evidence of the extraneous offenses must also be given less weight because of the strength of the State’s identification evidence.  As stated in 
Montgomery
:  “When the proponent has other compelling or undisputed evidence to establish the proposition or fact that the extraneous misconduct goes to prove, the misconduct evidence will weigh 
far less than it otherwise might
 in the probative-versus-prejudicial balance.”  
Id. 
at 390 (emphasis added).  Lopez testified at trial that she saw appellant face-to-face in a lighted area.  Her testimony was corroborated by the evidence that her purse was found in the backyard of appellant’s next door neighbor.  Further, she picked appellant’s picture out of a photo spread and did not identify a second suspect in another photo spread.  Moreover, neither the limited defense cross-examination of Lopez nor the alibi testimony, much of which concerned the time-period of the extraneous offenses, significantly detracted from her testimony. On the other hand, however, in his closing argument appellant’s counsel repeatedly attacked Lopez’s identification of appellant and emphasized the alibi testimony.  Thus, we conclude that the first 
Montgomery
 factor weighs in favor of the inadmissibility of the extraneous offenses, but only slightly.

The second factor, that is, the potential the extraneous offense evidence has to impress the jury “in some irrational but nevertheless indelible way,” weighs  in favor of exclusion of evidence of the Linstead aggravated kidnapping and aggravated sexual assault but not the Davis kidnapping.  The State points out that the trial court instructed the jury to consider that evidence only for the purpose of identity and that we generally presume the jury follows the trial court’s instructions.  
Colburn v. State
, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998).  However, in this case, the nature of the extraneous offenses merits consideration.  One extraneous offense involved an aggravated kidnapping and aggravated sexual assault and the other involved the kidnapping of a woman and her baby.  “Both sexually related misconduct and misconduct involving children are inherently inflammatory.”  
Montgomery
, 810 S.W.2d at 397.  Thus, we hold that evidence of the Linstead offense was inherently inflammatory.  However, in the case of the Davis kidnapping, appellant did not threaten the child, nor did he harm the child in any way.  There is no evidence that appellant was even aware the child was in the car until Davis told him. While there is the possibility that the jury could have been influenced by the fact that appellant was consciously indifferent to the child and may have put the child in danger by driving erratically, we cannot conclude that the mere presence of the child in the van makes appellant’s actions “inherently inflammatory.”  Thus, while we hold that the evidence of the Linstead aggravated kidnapping and aggravated sexual assault involves an inherently inflammatory offense, and the danger of unfair prejudice from such evidence was substantial, we cannot conclude the same for the Davis kidnapping.

Additionally, while the charged robbery was aggravated because of use of a knife, the Linstead offense was even more aggravated in that it was prolonged, involved kidnapping to another place, and included a sexual assault.  By way of comparison, 
Ransom 
upheld admission of an extraneous offense where the extraneous offense was of a character that “pales in comparison” to the primary offense.  
Ransom
, 920 S.W.2d at 301.  Similarly, the court in 
Taylor
, held that a previous murder was “no more heinous” than the murder that was the subject of the prosecution and was thus “not likely to create such prejudice in the minds of the jury that it would have been unable to limit its consideration of the evidence to its proper purpose.”  
920 S.W.2d at 323
.  While the Davis offense did involve a kidnapping, appellant was stopped before leaving the apartment complex, and there is no evidence of where he was intending to take Davis or what he intended to do.  Accordingly, we hold that the second factor weighs in favor of appellant with respect to the Linstead offense, but not the Davis offense.  

The third factor, the time the proponent needs to develop the extraneous offense evidence, during which the jury is distracted from consideration of the indicted offense, also weighs in favor of exclusion of the Linstead offense, but not the Davis offense.  The evidence necessary to prove identity of the perpetrator of the aggravated sexual assault and aggravated kidnapping extraneous offense included extensive DNA testimony.  The State does not refute appellant’s calculation that over two-thirds of the testimony during the guilt/innocence phase of the trial concerned the extraneous offenses; our review of the record shows that just over half of the trial was devoted to the Linstead offense.  The State points out the “complexity of DNA evidence” and argues the time it spent on the aggravated sexual assault and aggravated kidnapping offense was reasonable because it had to go through “the tedious process of establishing that blood samples were taken, that the chain of custody thereof was maintained, and that all the DNA found on the victim could be explained as coming from her body, her consensual sexual partner’s body, and Appellant’s  body.”

Whatever the reasons, the extraneous aggravated sexual assault and aggravated kidnapping offense evidence in this case took more time at trial than the evidence of the charged offense.  On the other hand, the evidentiary portion of guilt/innocence lasted only two days; therefore, it is at least arguable whether the evidence significantly distracted the jury from consideration of the indicted offense given the short time frame of the guilt/innocence phase as a whole.  However, we are not convinced that the relatively short length of the trial mitigated the potential effect of the voluminous evidence of the Linstead offense of significantly distracting the jury from considering the evidence of the charged offense.  By way of contrast, while the State’s evidence of the Davis kidnapping consisted of three officers’ testimony, the time it took to develop this testimony was not as long as the time it took to introduce the aggravated sexual assault and aggravated kidnapping evidence and did not exceed the time the State spent on the charged offense.  Thus, the third factor weighs in favor of exclusion of the Linstead offense, but not the Davis offense.

Finally, we consider the fourth factor of the State’s need for the extraneous offense evidence.  In 
Lane
, the court held that the State’s need to offer evidence of the other murder of a child was “very strong” because identity was “hotly contested.” 
Lane
, 933 S.W.2d at 520-21.  The court explained:  “Appellant’s confessions constituted the 
only
 evidence connecting him to Bertha’s murder.  Appellant attacked the confessions as being involuntary and inaccurate.  Appellant also challenged identity by showing that the DNA test results could be interpreted as excluding him from being the perpetrator.”  
Id.

On the other hand, the Corpus Christi Court of Appeals recently held that the State’s need for extraneous offense evidence was “nonexistent” where the complainant in a burglary and sexual assault case was not impeached in any material respect; she had not made a misidentification; she had identified the defendant from a photo spread and not identified a second suspect; and her identification of the defendant had been heard by several officers.  
Reyes v. State, 
69 S.W.3d 725, 737 (Tex. App.—Corpus Christi 2002, pet. ref’d).

In the present case, Lopez testified that she saw appellant face-to-face in a lighted area as he robbed her, and her testimony was corroborated by evidence of the finding of her purse in the backyard next to appellant’s residence as well as evidence that she picked his picture out of a photo spread and did not identify a second suspect in another photo spread.  While her identification was disputed by cross-examination, her positive identification of appellant was not shaken or significantly undermined.  Finally, Lopez’s identification testimony was positive and unequivocal and was not tainted by any misidentification.  However, although appellant’s alibi testimony largely concerned his whereabouts in January 1999, the time period of the extraneous offenses, it also pertained to the mid-December time period when the charged offense was committed.  In addition, appellant’s counsel repeatedly attacked Lopez’s identification of appellant and emphasized appellant’s alibi.  While the present case is similar to 
Reyes, 
we believe that the State in this case did have a need for the evidence
.  
Thus, the factor of the State’s need for the extraneous offense evidence weighs in favor of admitting the testimony, but only slightly.

Our objective view of the 
relevant criteria under rule 403 therefore leads us to conclude that the danger of unfair prejudice substantially outweighed the probative value of the proffered evidence of the Linstead offense but not the Davis offense.  
See
 
Tex. R. Evid.
 403;
 Montgomery,
 810 S.W.2d at 392.  Consequently, we hold that the trial court abused its discretion in admitting the extraneous evidence of the Linstead offense, but not the Davis offense, at the guilt/innocence phase of the trial.  We overrule appellant’s second issue complaining of error in admitting evidence of the Davis offense.

VI. Harm Analysis

Because we hold that the trial court abused its discretion in admitting evidence of the Linstead offense because the danger of unfair prejudice to appellant substantially outweighed the probative value of the evidence, we must determine whether appellant was harmed by the error.  
See
 
Tex. R. App. P.
 44.2.  Error under the rules of evidence in the admission of evidence constitutes nonconstitutional error.  
See
 
Johnson v. State
, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).  A reviewing court is to disregard a nonconstitutional error that does not affect the substantial rights of the defendant.  
Tex. R. App. P.
 44.2(b).  A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury’s verdict.  
King v. State, 
953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing 
Kotteakos v. United States
, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)).  In 
Kotteakos, 
the United States Supreme Court explained:

[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment 
was not substantially swayed
 by the error, it is impossible to conclude that substantial rights were not affected.  The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error.  It is rather, even so, whether the error itself had
 substantial influence.  
If so,
 
or if one is left in grave doubt,
 
the conviction cannot stand
.
  

328 U.S. at 765, 66 S. Ct. at 1248 (emphasis added); 
see 
Motilla v. State,
 78 S.W.3d 352, 355-58 (Tex. Crim. App. 2002); 
Johnson v. State
, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001)
.   

The Supreme Court has defined “grave doubt” to mean “in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.” 
 
O'Neal v. McAninch
, 513 U.S. 432, 435, 115 S. Ct. 992, 994 (1995); 
Webb v. State
, 36 S.W.3d 164, 182-83 (Tex. App.—Houston [14
th
 Dist.] 2000, pet. ref’d)
.  If the reviewing court is unsure whether the error affected the outcome, the court should treat the error as harmful, i.e., as having a substantial and injurious effect or influence in determining the jury's verdict.  
O’Neal
, 513 U.S. at 435, 115 S. Ct. at 994; 
Webb
, 36 S.W.3d at 182-83
.

The defendant is not required to prove harm from an error.  
Johnson
, 43 S.W.3d at 4.  Indeed, there ordinarily is no way to prove “actual” harm.  
Id.  
It is instead the duty of the reviewing court to assess harm from the context of the error.  
Id
. Thus, the proper inquiry is whether the trial court’s error in allowing the State to prove up the Linstead extraneous offense substantially swayed or influenced the jury’s verdict, or whether we are left in grave doubt as to whether this extraneous offense evidence substantially swayed or influenced the jury’s verdict.  
Kotteakos, 
328 U.S. at 765, 66 S. Ct. at 1248; 
Johnson
, 43 S.W.3d at 4.  
In making this determination, we consider the trial court’s erroneous admission of the extraneous offense in the context of the entire record and not just whether there was sufficient or overwhelming evidence of the defendant’s guilt. 
Motilla,
 78 S.W.3d at 355-56.

A review of the record reveals the State spent just over half of the trial proving up an “inherently inflammatory” extraneous offense: aggravated kidnapping and aggravated sexual assault.  
See Montgomery
, 810 S.W.2d at 397.  Six witnesses, including a police officer, a sexual assault examiner, a forensic serologist, a forensic scientist and DNA analyst, a molecular biologist, and the victim, testified concerning the Linstead extraneous offense; five of these witnesses testified in depth about the sexual assault.  Testimony concerning the Linstead extraneous offense spans approximately 204 pages in the reporter’s record.  By way of contrast, to prove the primary, charged offense, the State called only four witnesses:  the victim, two police officers, and a woman who found the victim’s purse.  The entirety of the trial testimony concerning the primary offense, aggravated robbery with a deadly weapon, is contained in approximately 90 pages of the reporter’s record.

Linstead gave terrifying testimony concerning her aggravated kidnapping and aggravated sexual assault.  She testified that her attacker forced her to drive him a few blocks from her apartment, hit her in the head and screamed at her as she drove, raped her in the back seat of her car, and threatened to kill her between ten and fifteen times.  The attacker then took her purse, which was later found in the backyard next door to where appellant lived.  The State linked appellant to this offense through DNA testimony.  Throughout trial, the State presented and stressed the details of this extraneous offense, repeatedly referring to it as the “sexual assault.”

The State also repeatedly emphasized this extraneous offense in its closing argument. In fact, during closing argument, the State candidly acknowledged that it effectively had tried three cases in one.  
At one point, after noting the positive identification of appellant by the victim in this case, the State emphasized that it was the same man who had kidnapped and raped another woman in the same apartment complex, “whose DNA matches” appellant’s.  The State then told the jury it could “consider everything” in determining whether appellant committed the charged offense.

At the same time, the State repeatedly emphasized the positive and unequivocal identification of appellant by the victim in this case and conceded that, if the jury believed her testimony
, it established appellant’s guilt beyond a reasonable doubt.  Additionally, given the admission of the Davis extraneous offense, the State’s need for the Linstead extraneous offense was even less compelling on the issue of identity, and therefore possessed even less probative value.  
See id.
 at 390 (stating that misconduct evidence weighs far less in the probative-versus-prejudicial balance where there is other compelling or undisputed evidence to establish the proposition or fact that the extraneous misconduct goes to prove).  This militates towards a conclusion that the Linstead extraneous offense could have been considered for an improper purpose.

While there is sufficient evidence to support appellant’s guilt, the evidence of guilt is not so overwhelming that we can conclude with certainty that the Linstead extraneous offense had no influence or only a slight influence on the jury’s verdict.  
See Reyes,
 69 S.W.3d at 742 (noting that error which has no influence or only a slight influence on the verdict is harmless, while uncertainty over whether the error affected the outcome is harmful error);
 see also Motilla,
 78 S.W.3d at 356-57 (holding that evidence of overwhelming guilt is only one of several factors that should be considered in a rule 44.2(b) harm analysis);
 Page v. State,
 88 S.W.3d 755, 767 (Tex. App.—Corpus Christi 2002, pet. filed) (applying 
Motilla
 and holding that because complainant’s credibility was at issue, evidence of guilt was “far from overwhelming”).  

Extraneous offense evidence can have a devastating impact on the jury's rational disposition towards other evidence because of the jury's natural inclination to infer guilt to the charged offense from the extraneous offenses.  
See Abdnor v. State
, 871 S.W.2d 726, 738 (Tex. Crim. App. 1994); 
Mayes v. State
, 816 S.W.2d 79, 86 (Tex. Crim. App. 1991)
.  Thus, we cannot say that, with fair assurance after pondering all that happened at trial, that the inordinate amount of trial time spent proving the inherently inflammatory extraneous offense and the State’s repeated emphasis on the extraneous offense did not have a substantial and injurious effect or influence on the jury’s verdict.  
See, e.g.
, 
Page,
 88 S.W.3d at 767-78 (holding erroneous admission of extraneous offense evidence was harmful); 
Reyes
, 69 S.W.3d at 742-43 (same); 
DeLeon v. State
, 77 S.W.3d 300, 316 (Tex. App.—Austin 2001, pet. ref’d) (same); 
Webb
, 36 S.W.3d at 182-84 (same);
 
Avila
, 18 S.W.3d at 741-42 (same); 
Hilliard v. State
, 881 S.W.2d 917, 921-22 (Tex. App.—Fort Worth 1994, no pet.) (same).

Basic, black-letter law prohibits the State from trying a defendant for a collateral offense or for being a criminal generally.  
Williams v. State
, 662 S.W.2d 344, 346 (Tex. Crim. App. 1983); 
Ridgely v. State
, 756 S.W.2d 870, 872 (Tex. App.—Fort Worth 1988, no pet.).  Given that the extraneous offense evidence was inherently prejudicial, possessed an extremely low probative value, and was erroneously admitted; and considering the voluminous amount of evidence, trial time, and repeated emphasis by the State during trial and closing arguments regarding the extraneous offense, it appears that appellant was improperly tried for a collateral offense or for being a criminal generally.  We are left with grave doubts whether the error itself, placing a large volume—just over half of the trial—of detailed, inherently inflammatory extraneous offense evidence before the jury, had a 
substantial influence
 on the jury’s verdict.  Therefore, 
we sustain appellant’s first issue as to error in admission of evidence of the Linstead offense.  

VII.   
Conclusion

Having sustained appellant’s first issue, we reverse the trial court’s judgment and remand the case for a new trial. 

ANNE GARDNER

JUSTICE

PANEL F: LIVINGSTON, GARDNER, and WALKER, JJ.

LIVINGSTON, J. filed a dissenting opinion.

PUBLISH

[DELIVERED JANUARY 23, 2003]

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-00-408-CR

DUWAN A. BOOKER APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY

------------

DISSENTING OPINION ON REHEARING

------------

I respectfully dissent because I do not believe the error in admitting the Linstead extraneous offense affected appellant’s substantial rights.  
See
 
Tex. R. App. P.
 44.2(b).

The evidence of appellant’s guilt in this case was strong.  Lopez saw her attacker at close range in a lighted area.  She was so sure about appellant’s identity that when shown a photo array with no pictures of appellant, she told the officer that the man who attacked her was not shown in the array.  Further she was able to confidently identify appellant as her attacker in both a later photo array and at trial.  Lopez’s identification of appellant was corroborated by the finding of her purse in the backyard of appellant’s next door neighbor and by the evidence of the Davis offense.  While appellant challenged Lopez’s identification of appellant on cross-examination and with alibi testimony, the alibi testimony was weak, and appellant was not able to seriously undermine the validity of Lopez’s identification. 
 

In addition, while the testimony about the Linstead offense constituted a large portion of the trial, the entire evidentiary portion of guilt/innocence lasted only two days.  In addition, most of the evidence of the sexual assault was limited to scientific DNA testimony rather than emotionally-charged details about the offense.  Thus, I believe that any potential the evidence of the Linstead offense had to distract the jury from its consideration of the charged offense was mitigated by the short time frame of the evidentiary portion of the trial and the technical nature of much of the testimony about the offense.

Finally, the majority opinion states that the Linstead offense had even less probative value in light of the admission of the Davis offense.  However, the Linstead offense was important in linking appellant to the Lopez aggravated robbery because its similarity to the Davis offense helps link the Davis offense to the Lopez aggravated robbery.  In the Davis offense, the attacker approached the victim in her car rather than on foot and did not steal anything from the victim.  This is also true of the Linstead offense.  But because the purses from the Linstead offense and the charged offense were found together, the Linstead offense has substantial similarities with the charged offense.  That substantial similarity, combined with the similarities between the Linstead offense and the Davis offense, help connect the Davis offense to the Lopez aggravated robbery.  Consequently, while I agree that the probative value of the evidence was somewhat lessened for the purposes of a rule 403 analysis because of the strength of Lopez’s identification of appellant, I do not agree that the probative value of the Linstead offense was lessened even further as a result of the admission of the Davis offense.  

After examining the record as a whole, I do not have “grave doubts” concerning whether the extraneous offense evidence had a substantial influence on the jury in its finding that appellant committed the charged robbery.  Rather, I view that evidence as having at most only a slight effect or influence.  
See Motilla v. State
, 78 S.W.3d 352, 360 (Tex. Crim. App. 2002). 

I would hold that the error did not affect appellant’s substantial rights and, thus, affirm appellant’s conviction. 
 Therefore, I must dissent. 

TERRIE LIVINGSTON

JUSTICE

PUBLISH

[DELIVERED JANUARY 23, 2003]

FOOTNOTES
1:
We note that 
Collazo
 and 
Bishop
 discussed the similarity issue in considering whether the prejudicial effect of the extraneous offense evidence outweighed its probative value, the issue under rule 403.  The more recent cases of 
Lane
 and 
Johnson
, however, discussed similarity in considering relevance of the evidence under rule 404(b), and we will do so likewise.    

COMMENTS AND ANNOTATIONS
Comment 1:
Majority by Justice Livingston; Dissent by Justice Walker

Comment 2:
Majority on reh'g by Justice Gardner; Dissent on reh'g by Justice Livingston