02-10-060--067-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

                                                   NOS. 02-10-00060-CR

                                                  02-10-00061-CR

                                                  02-10-00062-CR

                                                  02-10-00063-CR

                                                  02-10-00064-CR

                                                  02-10-00065-CR

                                                  02-10-00066-CR

                                                  02-10-00067-CR

 


 
 
 Dino Mejia
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE
 
 


 

----------

 

FROM THE 362nd
District Court OF Denton COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

 

          In
six points, pro se appellant Dino Mejia appeals his convictions for eight
burglaries.[2]  We affirm.

Background
Facts

          In 2008, through separate indictments, the
State charged appellant with burglarizing eight habitations.  The indictments
contained enhancement paragraphs alleging that appellant had been previously
convicted of two felonies.  The trial court appointed counsel to represent appellant,
and the parties filed several pretrial documents.

          A jury found appellant guilty of all eight
burglaries.  The trial court found the indictments’ enhancement paragraphs to
be true and sentenced appellant to seventy-five years’ confinement on each
offense.  The court ordered the sentences to run concurrently with each other,
but it decreed that all of the sentences could not begin to run until the
expiration of a sentence for appellant’s burglary conviction from Dallas
County.[3]  Appellant filed a motion
for new trial and brought these appeals.

Evidentiary Sufficiency

In
his first two points, appellant challenges the sufficiency of the evidence to
support his convictions.  In our due-process review of the
sufficiency of the evidence to support a conviction, we view all of the
evidence in the light most favorable to the verdict to determine whether any
rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319, 99
S. Ct. 2781, 2789 (1979); Isassi v. State, 330 S.W.3d 633, 638 (Tex. Crim.
App. 2010).[4]  This standard gives full
play to the responsibility of the trier of fact to resolve conflicts in the
testimony, to weigh the evidence, and to draw reasonable inferences from basic
facts to ultimate facts.  Jackson, 443 U.S. at 319, 99 S. Ct. at 2789; Isassi,
330 S.W.3d at 638.

The
trier of fact is the sole judge of the weight and credibility of the evidence. 
See Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); Brown v. State,
270 S.W.3d 564, 568 (Tex. Crim. App. 2008), cert. denied, 129 S. Ct.
2075 (2009); see also Bottenfield v. State, 77 S.W.3d 349, 355 (Tex.
App.—Fort Worth 2002, pet. ref’d) (“The jury is free to believe or disbelieve
the testimony of any witness, to reconcile conflicts in the testimony, and to
accept or reject any or all of the evidence of either side.”), cert. denied,
539 U.S. 916 (2003).  Thus, when performing an evidentiary sufficiency review,
we may not re-evaluate the weight and credibility of the evidence and
substitute our judgment for that of the factfinder.  Williams v. State,
235 S.W.3d 742, 750 (Tex. Crim. App. 2007).  Instead, we Adetermine
whether the necessary inferences are reasonable based upon the combined and
cumulative force of all the evidence when viewed in the light most favorable to
the verdict.@  Hooper v. State, 214 S.W.3d 9,
16–17 (Tex. Crim. App. 2007).  We must presume that the factfinder resolved any
conflicting inferences in favor of the verdict and defer to that resolution.  Jackson,
443 U.S. at 326, 99 S. Ct. at 2793; Isassi, 330 S.W.3d at 638.  The
standard of review is the same for direct and circumstantial evidence cases;
circumstantial evidence is as probative as direct evidence in establishing the
guilt of an actor.  Isassi, 330 S.W.3d at 638; Hooper, 214 S.W.3d
at 13.

A
person commits burglary if, without the effective consent of the owner, the
person enters a habitation and intends to commit theft, attempts to commit
theft, or commits theft.  Tex. Penal Code Ann. § 30.02(a)(1), (3); see also
Gilbertson v. State, 563 S.W.2d 606, 608 (Tex. Crim. App. [Panel Op.] 1978)
(explaining that a burglarious entry into a habitation may be established by
circumstantial evidence).  A person commits theft by unlawfully appropriating property
with intent to deprive the owner of it.  Tex. Penal Code Ann. § 31.03(a) (West Supp.
2011); Liggens v. State, 50 S.W.3d 657, 659 (Tex. App.—Fort Worth 2001,
pet. ref’d).  To “appropriate” personal property is “to acquire or otherwise
exercise control over” it.  Tex. Penal Code Ann. § 31.01(4)(B) (West Supp. 2011). 
Unexplained or unreasonably explained possession of recently stolen property by
the defendant may raise an inference of guilt.  See Rollerson v. State,
227 S.W.3d 718, 725 (Tex. Crim. App. 2007); Poncio v. State, 185 S.W.3d
904, 905 (Tex. Crim. App. 2006).

The State’s evidence

          The Mathis burglary


          On April 10, 2008,
Heather Mathis left her Lewisville home to work at a private preschool.  At the
end of the day, she picked up her son, went home, and noticed that “[e]verything
had been completely destroyed.”  A window was busted, picture frames were
broken, a back door was open, and Mathis’s bedroom had been ransacked.  Without
permission, someone had entered Mathis’s house and had taken a television, VCR,
DVD player, video camera, cash, checks, jewelry, and other items.

          The Goetz burglary

          Ruth Goetz arrived at her Lewisville home at
around 5 p.m. on April 30, 2008.  When Goetz drove through a gate to enter her
house’s backyard area, she noticed that the back door was open, and when she
walked in, she “realized that [she had] been burglarized.”  Goetz noticed that
her television was gone, her entertainment center was almost empty, some
jewelry and tools had been taken, and there were “things just thrown on the
floor.”  Because someone had taken her property without her permission, Goetz
called the police.

          The Marshall burglary

          The same day that
Goetz’s house was burglarized, Jennifer Marshall arrived home in Lewisville at
approximately 9 p.m.  Upon entering the house, Marshall noticed that lights
were on and that a laundry room door was open. Marshall called the police.  After
the police arrived, Marshall saw that a window was broken, and she noticed that
jewelry, a mandolin, and small electronics had been stolen.  Marshall later
recovered some of the stolen property from the police, but she did not recover
the mandolin.  She testified that she had not given anyone permission to be in
her home or to take her property.

          The Walker burglary

          On May 6, 2008, Matthew Walker went to his
Lewisville home after eating lunch with his wife, and when he arrived, he saw
muddy footprints on the carpet that had not previously been there.  When he
went upstairs, he noticed that items had been scattered on the floor and that
some of his property, including a television and two laptop computers, had been
taken without his permission.

          On the day of the robbery, one of Walker’s
neighbors, James Sterett, a convicted felon, came home from running errands and
saw a gray station wagon parked in his own driveway with duct tape covering the
license plate.  Sterett then saw a man coming from Walker’s house.  The man was
Hispanic, middle-aged, had a mustache, and was wearing jeans, a shirt, a light
jacket, and a cap.  Sterett approached the man and said, “Excuse me.  Can I
help you?”  The man responded that he was looking for a friend whom he thought
lived at Walker’s house.  The man then drove down an alley, but after Sterett
went inside his house, the man returned.  Sterett went back outside, and the
man drove away from the neighborhood.  When Sterett learned that Walker’s house
had been burglarized, he told the police about what he had seen.

          Some of Walker’s other neighbors, the
Buffingtons, had security cameras mounted on their house.  Walker viewed the
recording from the day of the robbery, and he brought pictures from the
recording to trial.

          Max Gehrke, a Lewisville police officer, was
assigned to investigate Walker’s burglary (along with Mathis’s burglary).  He
testified that the police could not find usable fingerprints at Walker’s house.[5] 
He viewed the Buffingtons’ security recording, which showed a gray Dodge
Magnum, a station-wagon-like car, that entered the alley of Walker’s residence
in the time fame of the burglary. Officer Gehrke put pictures taken from the
recording on ListServ, and the response that Officer Gehrke received caused him
to develop appellant as a suspect for the burglary.[6]

          Weeks after the burglary, Officer Gehrke showed
Sterett a black and white photographic lineup with six similarly looking men, and
Sterett chose appellant as the man he had seen on May 6.  Sterett, who
testified that he is “very good at remembering faces,” also identified
appellant in court as the man with whom he had conversed near Walker’s house.[7] 
He testified, “I was trying to look very hard at [appellant’s] face . . . because
I knew he had to be doing something no-good with the duct tape on the license
plate, . . . and I wanted to remember what he looked like.”  On cross-examination
by appellant’s counsel, Sterett conceded that he had not noticed tattoos on appellant
on the date of the offense.  Appellant testified later that he has two tattoos
on his face.

          The Hernandez burglary

          After leaving work, Jaime Hernandez went to his
Flower Mound home with his wife and children on May 13, 2008.  When Hernandez entered
his house, he noticed that lights were on, there was a “mess on the floor,” and
a computer desk had been moved.  Hernandez called the police, and after they
arrived, Hernandez saw a shattered window and discovered that his computer and
some framed oil paintings were missing.  Hernandez had not given anyone
permission to enter his house or to take his property.

          The Whipple burglary

          On the afternoon of May 14, 2008, the day after
the burglary of Hernandez’s house, Melody Whipple arrived at her house and
noticed that her front door was unlocked, which was unusual.  After opening the
door, seeing that the back door was “wide open,” and noticing that a keyboard
had been placed upside down on the top of a couch, Whipple called 911.  When
the police arrived, Whipple learned that a burglar had taken cash, a plasma
television, a shotgun, two camcorders, a purse, silverware, and jewelry.  The
burglar had left a muddy footprint in the kitchen of Whipple’s home.

          The Stevenson burglary

          Chesley Stevenson and his wife, Karen, met his
sister-in-law for dinner on May 31, 2008.  After dinner, Stevenson’s wife spent
time with her sister while Stevenson went back to his Lewisville home.  When he
arrived there, he saw a “light blue” or “silverish” Dodge Magnum parked in the
grass behind his neighbor’s house.  Stevenson entered his back yard and saw
that the door to his house was open.  After Stevenson ran into the house, he
noticed that the master bedroom was in “disarray.”  When Stevenson went back
outside, the Dodge Magnum was gone.  Stevenson realized that without his
permission, someone had taken an entire jewelry chest, some CDs, power tools, and
cash from the house; he estimated the value of the items taken at $18,000.  Karen
testified that the pictures of the car from the Buffingtons’ surveillance
recording matched Chesley’s description of the uniquely colored car that he had
seen.

          The Lawlor burglary

          Lynn Lawlor arrived at her two-story Lewisville
home after work on June 4, 2008, and she found that a window was open and that
there were a “whole bunch of papers on the floor.”  Lawlor deduced that someone
had been in her house without her permission, and she called the police.  After
the police and Lawlor’s husband arrived, Lawlor noticed that parts of the house
had been ransacked and that several items were missing, including jewelry.  Lawlor
and her husband testified that they did not give anyone permission to enter
their home or to take their property.

          The Dallas burglary

          On June 10, 2008, Rebecca Cecil returned from
work to her duplex in Dallas.  In her neighbor’s driveway, Cecil saw a car that
was “greenish-gray” and “looked like one of those Dodge station wagons.”  The
car was running with no one in it.  While Cecil was still inside her garage,
she “heard some thumping upstairs.”  As Cecil approached the duplex, she saw a Hispanic,
middle-aged man moving around near the back of her fence.  Cecil asked him what
he was doing.  He replied, “I’m looking for somebody,” and then he got into the
running car and left.  Cecil went into the duplex, and in her bathroom, all of
the jewelry chest drawers were empty and were on the floor.  Cecil called the
police, and she eventually retrieved earrings, pins, watches, and other jewelry
that had been taken from her residence.  Cecil testified that appellant was the
man who had run near her fence and had left in the Dodge station wagon.[8]

          Portia Cooke, Cecil’s neighbor in the duplex,
saw a gray Dodge Magnum outside of the duplex on the day that Cecil’s house was
burglarized.  Consistent with Sterett’s testimony in connection with the
burglary of Walker’s house, Cooke testified that the Magnum had “tape over the
plate in the back.”  Cooke testified that the car she had seen matched the make
and model of the one displayed by the photographs taken from the Buffingtons’
surveillance recording.

          The police’s investigation of the burglaries

          Detectives gathered information by which they
believed that the eight Denton County burglaries were linked together.  Specifically,
the method of the burglaries, the types of items that were taken, and the
neighborhoods they were committed in were similar.

          On June 10, 2008, the same day as Cecil’s
burglary and appellant’s arrest, Dallas Police Department (DPD) Officers Corey
Parker and Michael Clifford, along with Detective Fred Mends, were at Budget
Suites on Stemmons Freeway for several hours to watch room 3073, which they
believed to be associated with appellant.  The officers eventually saw Mickie
Young leave the room, and they believed, based on a conversation with Young,
that they had consent to search it.  The officers never saw appellant enter or
leave room 3073.  Upon searching room 3073, which appeared to be occupied by a
man and a woman based on the types of clothes there, the police found jewelry,
fur coats, cologne, perfume, and paintings; the officers had to call for a
truck because there was “[t]oo much property to put in [their] cars.”

          After seizing these items, the officers took them
to a police station so that “different complainants all over the Metroplex”
could identify and retrieve their property.  The next morning, the DPD assigned
Detective Philip Strodtman to take over the investigation of the burglaries
associated with the property found in room 3073.  Detective Strodtman communicated
with officers in other police agencies and released various items of property to
their owners.  Stevenson, Goetz, Mathis, Marshall, Hernandez, Whipple, and Lawlor
all identified property they owned that had been seized from room 3073.

          Diane Willis was managing the Budget Suites on Stemmons
Freeway in June 2008.  Willis testified that room 3073 was leased to Young and
appellant, although Young paid the rent.  Willis had not noticed appellant
entering room 3073, but she had seen appellant “[m]any times” in the company of
Young.  She confirmed that appellant was “registered to the room,” and she knew
that appellant drove a “gray-silver” Dodge Magnum for eight months to a year
preceding his arrest.  According to Willis, appellant had been at Budget Suites
on the night of his arrest, and about a week before that, she had seen him
unload groceries into room 3073.

          Lewisville Police Department Detective David
Henley investigated the burglary of the Stevensons’ house, Goetz’s house, and
Marshall’s house.  After receiving information from Detective Philip Strodtman
on ListServ concerning appellant, in June 2008, Detective Henley entered
appellant’s name into LeadsOnline, which led Detective Henley to visit Cash
Pawn No. 25, to take pictures of some of the items held there, and to eventually
seize those items.  Joel Mendez, who manages that pawnshop, testified that the pawnshop
requires identification from people who sell merchandise to the store.  The pawnshop
also classifies all of the items that are pawned or sold to the shop by the
people who sell them.  Mendez testified that appellant had sold items to the
pawnshop in 2008 on June 1 and June 5.  An exhibit shows that appellant
received more than $1,000 for pawning thirty-eight items on those days.  Among
those items were diamond rings, birthstone rings, a wedding band, and gold
earrings.  Some of the Lawlors’ property, taken on June 4, 2008, was recovered
at the pawn shop.

          Detective Henley also visited Detective
Strodtman, saw hundreds of items that the DPD had seized from room 3073, and
took photographs of the items.  He contacted the victims of the burglaries
that he was investigating to ask them to look at the photographs and possibly
recognize some of the items displayed in them.  Goetz, Marshall, and the
Stevensons all recognized items in the photographs, retrieved the items from
Dallas, and then brought the items back to Detective Henley so that he could photograph
them individually.

          Flower Mound Police Department Detective John
Ryckeley investigated the Hernandez and Whipple burglaries.  Detective Ryckeley
noticed muddy shoeprints in Whipple’s house and identified pictures of the shoeprints
at trial.  Later, through ListServ, the DPD contacted Detective Ryckeley to
tell him that some of the property taken from Hernandez and Whipple may have
been recovered from room 3073, and Hernandez and Whipple identified their
property.  After appellant’s arrest, Detective Ryckeley visited him in jail,
seized his Nike shoes through a warrant, and discovered that the size and pattern
on the shoes’ soles matched the size and pattern of the shoeprints at Whipple’s
house.

Appellant’s evidence

          Rita Lara, appellant’s cousin, testified that from
November 2007 to April 2008, appellant lived with her at an apartment in
Arlington.  From November 2007 to January 2008, Lara sometimes drove appellant
to Bridgeport, where he was working three to four days per week for an oil
company.  In early 2008, appellant stopped working, and he acquired a gray Dodge
Magnum.  Lara did not know where appellant resided when he stopped living with
her, and she had “no idea” what he did to earn money from January until April
2008.

          Appellant, who acknowledged that he had
previously been convicted of three burglaries and theft, along with other
offenses, testified that he worked for Express Energy in Bridgeport from August
2007 until November 2007, when he got laid off.  In January 2008, he began
working eighty to one hundred hours per week in Burleson for Frank’s Casing
Crew, and that job ended in April 2008.  Working so many hours enabled him to
buy the Dodge Magnum.  Appellant said that in April 2008, he began living in
Dallas with three other men, whom he occasionally let borrow his car.

          Appellant testified that on the night of his
arrest, June 10, 2008, he dropped Young off at Budget Suites at around 9 p.m.  When
he left the parking lot, the police stopped and arrested him.  Appellant confirmed
that he knew Young, and he described her as a friend.  He said that he signed
the lease for room 3073 because Young wanted to live there but did not have
valid identification, and he testified that he later tried to remove his name
from the lease.  Appellant claimed, however, that he never lived or spent the
night there, did not have a key to the room, and did not know of any property
located there.[9]  He testified that
Willis’s testimony that he frequently went there was wrong, although he conceded
that he went there to help Young buy groceries about once every three weeks.

          Appellant agreed that he had sold items to a
pawnshop and that those items had been taken from the burglary victims’ homes,
but he denied knowing or suspecting that the items had been stolen.  When his
counsel asked him what reasonable explanation he could give the jury about why
he had possession of the items that had been stolen, he said, “The reason I had
that jewelry is because Ms. Young gave it to me.  She needed money, and she
didn’t have no I.D.  And I took it over there and sold it for her.  That money
went directly to her.”

          Appellant admitted that Cecil saw him near her duplex
on the day she was burglarized, and he conceded that he had tape on his license
plate, but he denied committing that burglary.  Instead, he said that he had
driven near Cecil’s duplex because he had gotten lost while looking for Young near
a “big building” on Royal Lane.  He testified,

          So when I
didn’t see Ms. Young standing anywhere, I just randomly just parked there and
got out and walked and took a -- just looked around and came right back.  And
just as I came back to get in my car and drive off, that’s when I had my
encounter with Ms. Cecil.

 

Concerning appellant’s presence at Cecil’s duplex, the
following exchange occurred during the State’s cross-examination:

          Q.  Now,
you understand that Ms. Cecil has testified that her house was burglarized.

 

          A.  Yes, I
sure [do].

 

          Q.  And you
understand that you parked in the driveway right next door to her house that
was burglarized on the day that you were parked there.

 

          A.  Exactly.

 

          Q.  And you
understand that the property that was stolen from her house just happened to
end up in the Budget Suites room that’s rented in your name.

 

          A.  Exactly.
 Yeah, that I understand.

 

          Q.  That’s
just circumstance.  Right?  That’s just bad luck on your part, I guess.

 

          A.  Exactly.

 

          Appellant
admitted that the shoes he wore matched the tread pattern and size of prints
that were found in Whipple’s house, and he testified that it was also merely bad
luck for that match to be coupled with the fact that the police found property
from Whipple’s house in room 3073.

          Appellant denied seeing Sterett and said that
Sterett had “outright lied” about his encounter with appellant in connection
with the robbery of Walker’s house.  Appellant also denied committing each burglary
described above.

Analysis

          Appellant asserts that the State did not prove
that he had entered the victims’ homes or had possessed their property.  But the
evidence establishes that eight similarly executed burglaries, at six homes in
Lewisville and two homes in Flower Mound, all occurred in less than two months. 
In seven of the eight burglaries, the victims identified their stolen property as
the same property that the police had seized from room 3073.[10]
 Appellant’s association with room 3073 was not exclusive, but the association enabled
the jury to focus on either appellant or Young, the only people that the
evidence connected to room 3073, as the burglar.  Appellant contends that he did
not reside with Young in that room, did not have personal belongings there, and
did not possess the stolen property that the police found there.  But the jury
was free to reject those theories, see Bottenfield, 77 S.W.3d at 355, and
it had rational, circumstantial reasons to do so because appellant’s name was
on the lease for the room, the police found men’s clothes in the room upon
searching it (and there is no evidence of any other male associated with that
room), Willis testified that she had seen him at the Budget Suites “[m]any
times” and on a “pretty regular basis” until his arrest in June 2008, and the
State impeached appellant’s credibility with evidence of previous burglary
convictions.  See Tex. R. Evid. 609(a); Woodall v. State, 77
S.W.3d 388, 394 (Tex. App.—Fort Worth 2002, pet. ref’d).

          Other facts could have allowed the jury to rationally
infer that appellant, not Young, committed each of the burglaries.  First, the
size and pattern of appellant’s shoeprints matched shoeprints found at Whipple’s
house.  Appellant relies on Casel v. State to argue that the matching
shoeprints are not probative, but in that case, a match between shoeprints at
the scene and the shoes the defendant wore while detained for questioning was
the “only evidence connecting [the defendant] with the burglary.”  605 S.W.2d
609, 610 (Tex. Crim. App. [Panel Op.] 1980); see also Harris v. State,
163 Tex. Crim. 519, 521, 294 S.W.2d 123, 124 (1956) (“It has long been the
established rule of law that, ordinarily, identity of an accused may not be
established by tracks alone.”).  Here, the State does not rely solely on the
shoeprint match to link appellant to the burglaries.

          Second, Sterett testified that he had talked to
appellant near Walker’s residence on the date of the burglary of that house.  Appellant
denied this fact. Although Sterett initially told the police that appellant had
missing teeth, and although Sterett had not recalled seeing tattoos on
appellant’s face on the day the burglary occurred, the jury had rational reasons
to accept Sterett’s testimony and reject appellant’s testimony.  For example, Sterett
remembered that appellant had covered part of his license plate with duct tape,
and appellant conceded that he had covered the license plate in a similar way on
another occasion.  Also, when Officer Gehrke showed Sterett the photographic
lineup, it took Sterett less than two seconds to recognize appellant.  We must
defer to the jury’s implicit resolution of conflicts between Sterett’s
testimony about how appellant looked on the date of Walker’s burglary and
appellant’s later appearance at trial.  See Jackson,
443 U.S. at 326, 99 S. Ct. at 2793; Isassi, 330 S.W.3d at 638.

          Third, appellant’s Dodge Magnum matched the car
associated with Walker’s burglary (by Sterett and by the Buffingtons’ security
recording), Stevenson’s burglary, and Cecil’s burglary.  Fourth, the police
found some of the Lawlors’ property at a pawnshop in Dallas; the manager of
that pawnshop testified, and appellant acknowledged, that appellant had sold
property to the pawnshop.  Fifth, no similar facts connected Young or anyone
else to any of the burglaries.  Cf. Rollerson, 227 S.W.3d at 725–26.

          Furthermore, the jury could have rationally
rejected the parts of appellant’s testimony that, if believed, could have
weighed against his involvement in the burglaries.  See Bottenfield, 77
S.W.3d at 355.  Although appellant said that at the time of the burglaries, he was
living in Dallas with three men rather than at room 3073, none of these men
corroborated appellant’s testimony.  The jury could have also rationally disbelieved
appellant’s claims that he took thirty-eight items of valuable property from
Young and sold them to the pawnshop on her behalf without having any knowledge
about the items being stolen and without asking Young about where, when, or how
she acquired the property.  Finally, the jury could have rationally rejected
appellant’s claim that it was merely bad luck that his interaction with Cecil
near her duplex coincided with her property being found in room 3073 on the
same day.

          Appellant asserts on appeal that the evidence
shows that he did not have a key to room 3073 upon his arrest.  Appellant
testified that he did not have a key to room 3073, but based on the evidence
described above concerning appellant’s recurring presence at Budget Suites, his
unloading of groceries there, and the presence of men’s clothing in the room
when officers searched it, the jury could have rationally rejected appellant’s
testimony.  Also, while the State stipulated that “no set of keys was taken
into the defendant’s personal property when he was arrested,” this stipulation
does not show that appellant did not have keys when he was arrested (the
evidence shows that he was driving a car).  Furthermore, even if appellant did
not have a key to room 3073, he still could have resided there or stored the
items he had stolen there.

          Contrary to the arguments in appellant’s brief,
the jury’s verdicts of conviction do not necessarily hinge upon appellant’s
recent possession of stolen property.  See, e.g., Rollerson, 227
S.W.3d at 727–28 (citing O’Fallin v. State, 75 Tex. Crim. 47, 50, 169
S.W. 897, 899 (1914) (op. on reh’g)); Martin v. State, Nos. 14-10-00440-CR,
14-10-00441-CR, 2011 WL 6916759, at *9 (Tex. App.—Houston [14th Dist.] Dec. 29,
2011, no pet. h.) (mem. op., not designated for publication) (“[T]he fact that
appellant was found in possession of some of Mario’s property . . . was merely
an additional circumstance the jury could have considered along with the other
evidence outlined above when determining he committed the burglary.”).  Nor do
the verdicts require appellant’s exclusive possession of room 3073 or rest only
upon the law of parties.[11]

          Also, we do not agree with appellant’s numerous
contentions that his burglary charges rest on Young’s implication of him as a
co-occupant with her in room 3073.  While the record shows that officers
believed that they had obtained consent to search room 3073 from Young, we have
not located evidence indicating that Young said anything about appellant on the
night the officers searched room 3073.  Moreover, without any statement by
Young, the jury could have rationally linked appellant to room 3073 through
Willis’s testimony.

          Next, appellant contends that the evidence is
insufficient because there is no evidence of appellant’s flight during his
arrest, there were no witnesses to the entries into the habitations, appellant
was not present during the search, there were no rent receipts from room 3073
with appellant’s name on them, and the lease of room 3073 was not introduced as
an exhibit.  But the jury could have rationally found that the absence of these
facts does not outweigh the probative value of the circumstantial evidence
linking appellant to the burglaries.  Cf. Stevenson v. State, 304 S.W.3d
603, 615 (Tex. App.—Fort Worth 2010, no pet.) (“The absence of the money—the
purpose of the robbery—and the absence of the gun—the instrument of death according
to the medical examiner’s testimony—make no difference in the analysis when
circumstantial evidence, by itself, can be enough to support the jury’s verdict.”).

          Viewing all of the evidence in the light most
favorable to the jury’s verdicts, and deferring to the jury’s authority to draw
reasonable inferences from basic facts to ultimate facts, we conclude that the
evidence was sufficient to enable the jury to rationally find, beyond a
reasonable doubt, that appellant committed each of eight similar, linked
burglaries by entering each victim’s habitation to commit theft.  See Jackson,
443 U.S. at 319, 99 S. Ct. at 2789; Isassi, 330 S.W.3d at 638; see
also Kuczaj v. State, 848 S.W.2d 284, 287–89 (Tex. App.—Fort Worth 1993, no
pet.) (holding that the evidence was sufficient to sustain the defendant’s
burglary conviction when he had been seen near the place of the burglary on the
date of the burglary and had pawned items taken during the burglary).  We overrule
appellant’s first two points.

Appellant’s Right to
Confront Young

          In his third point, appellant contends that the
trial court abused its discretion by permitting Detective Mends’s testimony
“that inferentially or indirectly presented to the jury Mickie Young’s out of
court testimonial statement . . . that identified appellant as a resident”
of room 3073.  Appellant argues that the admission of this alleged testimony
violated his “constitutional right to confrontation and cross-examination”
under the federal and state constitutions.  See Crawford v. Washington,
541 U.S. 36, 68, 124 S. Ct. 1354, 1374 (2004) (explaining that the Confrontation
Clause of the Sixth Amendment requires the declarant’s unavailability and a
prior opportunity for cross-examination before an out-of-court testimonial
statement may be admitted).

          In the part of the record that appellant refers
to in his brief, Detective Mends did not state that Young told officers
anything about appellant’s connection to room 3073, and we have not located any
other place in the record where Detective Mends or another witness made such a
statement.  Instead, Detective Mends testified only that based on officers’
conversations with Young, they believed that they had consent to search room
3073.  When the prosecutor asked Detective Mends about the purpose of going to
the Budget Suites, Detective Mends said, “I understand that the defendant had a
room there, and we wanted to get into the room and figure out what was there.” 
This statement does not indicate the source of Detective Mends’s understanding
about appellant’s connection to the room or necessarily infer that his
understanding came from the officers’ conversation with Young.  Thus, we
disagree with appellant that Detective Mends presented an out-of-court
statement by Young that connected appellant to room 3073.  And even if
Detective Mends had done so, appellant did not object to any of Detective
Mends’s testimony, and he therefore forfeited any confrontation-based complaint
that he had about it.[12]  See Tex. R.
App. P. 33.1(a)(1); Paredes v. State, 129 S.W.3d 530, 535 (Tex. Crim.
App. 2004); Davis v. State, 268 S.W.3d 683, 708 (Tex. App.—Fort Worth
2008, pet. ref’d).  Because the record does not support appellant’s third point
and because he forfeited the complaint related to that point, we overrule it.

Appellant’s Motion to
Suppress

          In his fourth point, appellant contends that the
trial court erred by denying his motion to suppress, thus “causing these eight
convictions to rest on illegally obtained evidence.”  Specifically, appellant
argues that the police obtained evidence from an arrest that was illegal under
federal and state law.

          We review a trial court’s
ruling on a motion to suppress evidence under a bifurcated standard.  Amador
v. State, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007).  We give almost total
deference to a trial court’s rulings on questions of historical fact and
application-of-law-to-fact questions that turn on an evaluation of credibility
and demeanor, but we review de novo application-of-law-to-fact questions
that do not turn on credibility and demeanor.  Id.

          Before trial, appellant filed a pro se motion
to suppress all evidence that was the fruit of his allegedly illegal arrest on
June 10, 2008.  In the motion, appellant stated that the police had conducted
surveillance of Young in room 3073 after he had dropped her off at Budget
Suites that night.  He conceded that Young got out of his car before he was
arrested, but he nonetheless asserted that the evidence that the police
obtained from room 3073 after obtaining Young’s consent to search it was “fruit
of the poisonous tree” of his arrest.

          During the hearing on appellant’s motion, Detective
Strodtman testified that there were active warrants for appellant’s arrest on
June 10, 2008, including a Tarrant County warrant for burglary, and that the
arrest report showed that officers had confirmed the warrants before arresting
appellant.  Detective Strodtman did not, however, produce the warrants during
the initial suppression hearing.  He explained that officers had been
instructed, based on information conveyed by Cecil and obtained from a burglary
of a Dallas business, to look for appellant to be driving a 2005 Dodge Magnum
with a specific license plate number.

          After testimony concluded, appellant argued
that his arrest was illegal because the State had not presented a valid arrest
warrant.  Relying on a decision from the Houston (Fourteenth District) Court of
Appeals,[13] the trial court initially
granted appellant’s motion to suppress to the extent that the court excluded
any evidence that the police obtained as a result of appellant’s arrest
(although the court noted that it had not seen any such evidence), but the
court denied the motion regarding the search of room 3073 because appellant had
not connected any illegality in his arrest to that search.  Later on the same
day as the trial court’s initial suppression ruling, the State presented a
certified copy of the warrant leading to appellant’s arrest, which showed that
the warrant was executed on June 10, 2008.  Appellant objected to reopening the
suppression issue on the ground that doing so would be “unfairly prejudicial.” 
The trial court overruled appellant’s objection, admitted the certified copy of
the warrant into evidence, reconsidered its initial suppression ruling, and wholly
denied appellant’s motion to suppress.

Even
if we were to hold that the trial court incorrectly reopened the suppression
motion and wrongly reversed its initial decision to suppress evidence that the
police obtained as a result of appellant’s arrest, we would be required to
determine whether the trial court’s error caused harm under the standard of
Texas Rule of Appellate Procedure 44.2(a).  See Tex. R. App. P.
44.2(a); Hernandez v. State, 60 S.W.3d 106, 108 (Tex. Crim. App. 2001). 
Under that rule, the question is whether the trial court=s ultimate
denial of appellant’s motion to suppress was harmless beyond a
reasonable doubt.  See Williams v. State, 958 S.W.2d 186, 194 (Tex.
Crim. App. 1997).  In applying the Aharmless
error@
test, our primary question is whether there is a Areasonable
possibility@ that the error might have contributed
to the conviction.  Mosley v. State, 983 S.W.2d 249, 259 (Tex. Crim.
App. 1998) (op. on reh’g), cert. denied, 526 U.S. 1070 (1999).

          If
an arrest is illegal, a trial court must suppress evidence that arises from the
exploitation of that illegality.  State v. Iduarte, 268 S.W.3d 544, 551
(Tex. Crim. App. 2008).  In other words, the acquisition of the evidence sought
to be suppressed must be causally connected to the police’s illegal act.  See
id.; State v. Purdy, 244 S.W.3d 591, 595 (Tex. App.—Dallas 2008,
pet. ref’d).

          At trial, appellant failed to establish a
causal connection between his allegedly illegal arrest and the evidence that he
sought to suppress through his motion.  On the first full day of the trial, in
a hearing outside of the jury’s presence, the judge said,

          [Appellant’s
counsel], talk about your concern about an illegal arrest.  If the arrest was
illegal, what evidence did the State obtain from an illegal arrest?  Because
that’s what I’m looking for.  If there’s something to suppress, any statements
or any evidence from the illegal arrest, then we need to discuss that now.

Counsel
responded by asserting that appellant’s arrest was connected to the property
found in room 3073 and by stating, “Anything found after that illegal arrest we
believe should be suppressed as the fruits of an illegal arrest . . . .”  The
trial court again pressed counsel by asking, “What did they gain from that
arrest?”  Counsel mentioned the police’s allegedly improper surveillance of
Young[14] and referred again to
the search of room 3073.  Appellant’s counsel later represented that no
evidence was found on appellant when he was arrested, that appellant had not made
statements upon the arrest, and that he was moving to suppress the property
found in room 3073.

          The
next day, at another hearing outside of the jury’s presence, appellant’s
counsel contended that appellant had been arrested illegally and urged that
“any witnesses or information or property found after that arrest be suppressed
and excluded from [the] trial.”  He particularly asserted that items found upon
the search of room 3073 should be suppressed because the police did not have
probable cause to search the room and because Young, who had given consent for
officers to search the room, did not appear at the trial and could not be confronted
about whether the consent was voluntary.

          Counsel
argued that Young was a “witness that came about from the arrest of
[appellant].”  But counsel admitted that appellant had not given information
about Young to the police, that appellant had dropped off Young at the motel
prior to his arrest, and that the police had begun surveillance on the motel
room and on Young before the arrest.  The trial court asked counsel, “What did [appellant]
give [the police] after the arrest that leads them to her that you say is fruit
of the poisonous tree?”  Counsel responded that appellant “didn’t give them any
information . . . other than he dropped her off.  And I guess she became a
suspect at that point by the police.”  On appeal, appellant concedes that he
and Young were detected by officers “in the vehicle prior to the detention
and arrest upon arriving at Budget Suites to leave Ms. Young there.” 
[Emphasis added.]

          Because
the record shows that the police began surveillance of Young before appellant’s
arrest and obtained her consent to search room 3073 independent of the arrest,
we hold that appellant failed to establish a causal connection between his
arrest and the property found in room 3073.  Thus, we hold that any possible error
of the trial court in deciding that the arrest was legal is harmless beyond a
reasonable doubt.  See Tex. R. App. P. 44.2(a).

          On appeal, appellant claims that the officers’
discovery of his driver’s license (which he says was used for the photographic
lineups shown to Cecil and Sterett) and the police’s discovery of his
shoeprints were products of his arrest.  But at trial, on the basis of his
allegedly illegal arrest, appellant did not specifically seek to exclude
anything other than the police’s interaction with Young and their search of
room 3073.  Thus, we hold that appellant forfeited his complaint that other
evidence should have been excluded.  See Tex. R. App. P. 33.1(a); Wilson
v. State, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002) (“[T]he point of error
on appeal must comport with the objection made at trial.”); Aguilar v. State,
26 S.W.3d 901, 905–06 (Tex. Crim. App. 2000) (explaining that rule 33.1
requires specificity for evidentiary objections).

          Finally, to the extent that appellant attempts on
appeal to challenge the police’s warrantless but consensual search of room 3073
on a basis that is independent of the legality of his arrest, we note that at
the hearing on appellant’s motion to suppress, appellant’s counsel said that
appellant was “not claiming standing in [the] motel room” and had no expectation
of privacy in the room.  Appellant repeated in his testimony before
the jury that he did not have an expectation of privacy in the room.  Thus,
appellant’s challenge to the search of the room, if any, fails on the ground
that he lacks standing.  See Kothe v. State, 152 S.W.3d 54, 60 (Tex.
Crim. App. 2004).

          For all of these reasons, we overrule
appellant’s fourth point.

The Admission of an
Extraneous Offense

          In
his fifth point, appellant asserts that the trial court abused its discretion
by admitting evidence of Cecil’s burglary, which was an extraneous offense.  We review
the trial court’s admission of evidence under an abuse of discretion standard.  Price
v. State, 351 S.W.3d 148, 150 (Tex. App.—Fort Worth 2011, pet. ref’d); see
Montgomery v. State, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on
reh’g).  Under this standard, the trial court’s ruling will be upheld as long
as it falls within the “zone of reasonable disagreement.”  Karnes v. State,
127 S.W.3d 184, 189 (Tex. App.—Fort Worth 2003, pet. ref’d), cert. denied,
129 S. Ct. 2391 (2009).

          “Evidence of other crimes, wrongs or acts is
not admissible to prove the character of a person in order to show action in
conformity therewith.  It may, however, be admissible for other purposes, such
as proof of motive, opportunity, intent, preparation, plan, knowledge,
identity, or absence of mistake or accident . . . .”  Tex. R.
Evid. 404(b); see Montgomery, 810 S.W.2d at 387–88; see also Segundo
v. State, 270 S.W.3d 79, 87 (Tex. Crim. App. 2008) (explaining that the
defendant is generally to be tried only for the offense charged, not for any
other crimes), cert. denied, 130 S. Ct. 53 (2009).  The State, as the
proponent of extraneous offense evidence, bears the burden of showing
admissibility.  Russell v. State, 113 S.W.3d 530, 535 (Tex. App.—Fort
Worth 2003, pet. ref’d).  “Whether extraneous offense evidence has relevance
apart from character conformity, as required by Rule 404(b), is a question for
the trial court.”  Moses v. State, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003).

          Appellant contends on appeal that Cecil’s
burglary “had no connection to this offense . . . nor presented evidence of
motive, intent, plan and identity.”  Before Cecil testified, appellant objected
to the proposed testimony on the grounds that her testimony was unfairly
prejudicial and was irrelevant.[15]  The State
responded by arguing that Cecil’s testimony would be relevant to the issues of
appellant’s identity and motive.  The trial court overruled appellant’s
objection but gave the jury a limiting instruction.

          “Identity is an ‘elemental fact’ with relevance
apart from character conformity.”  Booker v. State, 103 S.W.3d 521, 530
(Tex. App.—Fort Worth 2003, pet. ref’d) (op. on reh’g).[16] 
For an extraneous offense to be admissible to show identity, identity must be
raised as an issue in the case.  Lane v. State, 933 S.W.2d 504, 519
(Tex. Crim. App. 1996).  A defendant may raise the issue of identity during
cross-examination of the State’s witnesses.  Id.; see Page v. State,
137 S.W.3d 75, 78 (Tex. Crim. App. 2004) (“Identity can be raised by defense
cross-examination, such as when the identifying witness is impeached on a
material detail of the identification.”).  In Page, the court of criminal
appeals determined that the defendant raised the issue of identity because
questioning of the State’s witness called into doubt either “her capacity to
observe (i.e., she was mistaken) or her truthfulness (i.e., she was lying), or
both, [and] the questions implied that the identification of appellant was not
trustworthy.”  137 S.W.3d at 78.

          Appellant’s trial counsel asked questions
during his cross-examination of Sterett that emphasized the issue of appellant’s
identity as the person who had committed the Walker burglary and who therefore
could be linked to the other burglaries.  Specifically, counsel questioned
Sterett about his statement to police that appellant had missing teeth and
about Sterett’s failure notice appellant’s tattoos.  See id. at 78 (“We
have held that the existence of a mustache can qualify as a material detail of
identification.”).  Counsel also questioned Sterett extensively about the
reliability of Sterett’s choice of appellant on a photographic lineup as the
man Sterett had seen near Walker’s house at the time of the burglary.  See
Burton v. State, 230 S.W.3d 846, 849–50 (Tex. App.—Houston [14th Dist.]
2007, no pet.) (holding that the defendant raised identity as an issue by
questioning the certainty of the victim’s identification of him through a
photographic lineup).  Thus, we conclude that appellant raised the issue of his
identity as the perpetrator of the eight linked burglaries.  See
Segundo, 270 S.W.3d at 86 (“The trial judge has considerable
latitude in determining that identity is, in fact, disputed.”).

          Even when identity is raised as an issue, an extraneous
offense is usually admissible only if the offense is so similar to a charged
offense as to illustrate the defendant’s distinctive and idiosyncratic manner
of committing criminal acts. See Page v. State, 213 S.W.3d 332, 336
(Tex. Crim. App. 2006); see also Segundo, 270 S.W.3d at 88 (explaining
that the common characteristics to show a link between the extraneous and
charged offenses may be proximity in time and place, mode of commission of the
crimes, the person’s dress, or any other elements that mark both crimes as
having been committed by the same person).

          Cecil’s burglary occurred within a month of
Lawlor’s, Stevenson’s, Whipple’s, and Hernandez’s burglaries and within two
months of all eight of the burglaries at issue.  See Walker v. State,
588 S.W.2d 920, 924 (Tex. Crim. App. [Panel Op.] 1979) (holding that several extraneous
offenses committed within one month of the charged offense were sufficiently
similar to the charged offense so as to be admissible to prove identity).  The
burglary of Cecil’s duplex occurred while Cecil was at work, just as had
occurred in Mathis’s, Goetz’s, Marshall’s, Hernandez’s, and Lawlor’s
burglaries.  Cecil noticed a Dodge station-wagon-like car at her house near the
time of the burglary, like Sterett had seen and the Buffingtons’ security
recording had displayed in connection with Walker’s burglary, and like
Stevenson had seen near his neighbor’s house.  When Cecil entered the duplex,
she noticed that the drawers of her jewelry chest had been emptied out.  Similarly,
Lawlor’s and Mathis’s jewelry armoires, Goetz’s jewelry box, and Stevenson’s
jewelry chest had been misplaced, and Marshall’s and Whipple’s jewelry had been
taken.  Also, Cecil’s neighbor, Cooke, saw tape over a gray Dodge Magnum’s
license plate, just as Sterett had seen.  Finally, and perhaps most
importantly, property taken during Cecil’s burglary, like property taken from
seven of the eight burglaries at issue, was found in room 3073, which the
evidence linked to appellant.

          We conclude that these similarities are
sufficient to sustain the trial court’s decision to admit the extraneous
offense of Cecil’s burglary for the purpose of proving identity.  See Ransom
v. State, 503 S.W.2d 810, 813–14 (Tex. Crim. App. 1974); Pena v. State,
867 S.W.2d 97, 99 (Tex. App.—Corpus Christi 1993, pet. ref’d) (holding that the
use of the same vehicle in the charged and extraneous burglaries was a
sufficient “signature” characteristic to justify the admission of the
extraneous burglary); see also Posey v. State, No. 05-02-00092-CR, 2003
WL 22383703, at *2 (Tex. App.—Dallas Oct. 20, 2003, no pet.) (mem. op., not
designated for publication) (holding that evidence of two extraneous burglaries
was admissible to show identity because, like the charged burglary, the
extraneous burglaries occurred during the day, the burglar ransacked the houses
he had burglarized, and the burglar pawned the items he had stolen).

          Appellant contends that even if evidence
concerning Cecil’s burglary was admissible under rule 404(b), the trial court
should have excluded the evidence under rule 403.  See Tex. R. Evid. 403
(stating that relevant evidence may be excluded “if its probative value is
substantially outweighed by the danger of unfair prejudice”).  If a trial court
determines that evidence of an extraneous offense has relevance aside from
character conformity, and a timely, proper rule 403 objection is made, the
trial court must make a balancing determination under rule 403.  Karnes,
127 S.W.3d at 191.  As we explained in Karnes,

Only “unfair”
prejudice provides the basis for exclusion of relevant evidence.  Unfair
prejudice arises from evidence that has an undue tendency to suggest that a
decision be made on an improper basis, commonly an emotional one.  Rule 403
favors admissibility and a presumption exists that relevant evidence will be
more probative than prejudicial.  In evaluating the trial court’s determination
under rule 403, a reviewing court is to reverse the trial court’s judgment
“rarely and only after a clear abuse of discretion,” recognizing that the trial
court is in a superior position to gauge the impact of the relevant evidence. 

 

          The trial
court’s balancing determination must be measured against the relevant criteria
by which a rule 403 decision is made. The relevant criteria in determining
whether the prejudice of an extraneous offense substantially outweighs its
probative value include:  (1) how compellingly the extraneous offense evidence
serves to make a fact of consequence more or less probable—a factor which is
related to the strength of the evidence presented by the proponent to show the
defendant in fact committed the extraneous offense; (2) the potential the other
offense evidence has to impress the jury “in some irrational but nevertheless
indelible way”; (3) the time the proponent will need to develop the evidence,
during which the jury will be distracted from consideration of the indicted
offense; and (4) the force of the proponent’s need for this evidence to prove a
fact of consequence, that is, does the proponent have other probative evidence
available to him to help establish this fact, and is this fact related to an
issue in dispute.  When the relevant criteria are viewed objectively and lead
to the conclusion that the danger of unfair prejudice substantially outweighs
the probative value of the proffered evidence, the appellate court should
declare that the trial court erred in failing to exclude it.

Id. at 191–92 (citations omitted).

          The admission of evidence of Cecil’s burglary,
through Cecil’s and Cooke’s testimony, made appellant’s identity as the burglar
of the eight homes at issue significantly more probable.  Cecil testified that after
leaving her job in the afternoon and arriving home, she saw a running but
parked Dodge station wagon.  After hearing “some thumping upstairs” and
“rustling in [her] backyard,” she saw appellant, who eventually got into the
car and left.  When she entered the house, Cecil realized that it had been burglarized. 
Just a few hours later, the police found Cecil’s property in room 3073.

          Cecil’s testimony provided unique evidence of a
close-in-time relationship between appellant’s presence at the site of a
burglary and the discovery of property, in room 3073, that was taken during the
burglary.  The testimony therefore significantly lessened the possibility that someone
else committed Cecil’s burglary and, by implication, the other burglaries associated
with the items found in room 3073.  For the same reason, Cecil’s testimony also
significantly undermined the credibility of appellant’s later testimony, in
which he minimized his connection with room 3073, stated that he had not been
inside room 3073 on the day of Cecil’s burglary, claimed ignorance of the stolen
nature of the property he had sold to the pawn shop, and asserted that it was
merely back luck that property stolen from Cecil’s house had arrived at room 3073.

          Cecil’s and Cooke’s testimony also strengthened
the credibility of Sterett’s testimony.  Cecil and Sterett were the only
witnesses who claimed to have seen appellant at a burglary scene, and they both
described his car as a gray station wagon.  Cooke testified that she had
noticed tape over a license plate on appellant’s car, and Sterett had recalled
seeing the same thing while testifying that he saw appellant and the car near
the scene of Walker’s burglary on the day that it occurred.  As we mentioned
above, appellant attacked Sterett’s identification through cross-examination,
and later, during appellant’s own testimony, he claimed that Sterett had lied. 
Of the eight charged burglaries, Sterett was the only witness who claimed to
have seen appellant near the crime scene, so the need for Cecil’s and Cooke’s
testimony to support Sterett’s testimony was significant.

          Cooke’s and Cecil’s testimony comprises
approximately twenty pages of the record that includes hundreds of pages of
testimony from other witnesses, so it is not likely that the extraneous offense
evidence distracted the jury from consideration of the indicted offenses.  Finally,
although we recognize that the evidence about Cecil’s burglary had the
potential to make an impression upon the jury of appellant’s guilt for the
charged burglaries, in light of our analysis above, we conclude that the trial
court could have reasonably determined that this impression was not irrational.

          We conclude that the trial court did not abuse
its discretion by siding with the presumption of admissibility under rule 403
and by implicitly determining that the evidence about Cecil’s burglary was not substantially
more prejudicial than probative.  See id.  Because we hold that the
trial court did not err by admitting the evidence under rules 403 and 404(b),
we overrule appellant’s fifth point.

The Cumulation of
Appellant’s Sentences

          In his sixth point, appellant
challenges the trial court’s decision to order that appellant’s eight sentences
subject to this appeal will begin to run after the expiration of his burglary
sentence from Dallas County.  In the first part of his sixth point, appellant
argues that the evidence is “insufficient to prove the prior offense alleged in
the State’s motion to cumulate.”  Specifically, he contends that the State did
not present a certified copy of his previous conviction or expert testimony to
identify him as the same person convicted in Dallas County.

          Under article 42.08 of the code of criminal
procedure,

When the same
defendant has been convicted in two or more cases, judgment and sentence shall
be pronounced in each case in the same manner as if there had been but one
conviction. . . .  [I]n the discretion of the court, the judgment in the second
and subsequent convictions may either be that the sentence imposed . . . shall
begin when the judgment and the sentence imposed . . . in the preceding
conviction has ceased to operate, or that the sentence imposed . . . shall run
concurrently with the other case or cases . . . .

Tex.
Code Crim. Proc. Ann. art. 42.08(a) (West Supp. 2011).

          “The
Legislature has assigned the task of cumulating sentences exclusively to the
trial judge. . . .  [W]hen a trial judge lawfully exercises the option to
cumulate, that decision is unassailable on appeal.”  Beedy v. State, 250
S.W.3d 107, 110 (Tex. Crim. App. 2008) (citations and footnotes omitted).  For an
order cumulating sentences to be valid, however, the record must sufficiently
link the defendant to the prior conviction.  See Miller v. State, 33
S.W.3d 257, 259–61 (Tex. Crim. App. 2000).  “[A]n admission by a defendant [is]
sufficient evidence to link the defendant to his prior convictions.”  Id.
at 262. 

          Before
trial, the State filed a “Motion for Cumulative Sentences,” stating that
appellant had been previously convicted of burglary in cause number F-0856627
in the “7th Criminal District Court” in Dallas County in February 2009.  During
the middle of the trial, while making an objection to Cecil’s testimony,
appellant’s counsel said,

Your Honor, we’d
object on this witness being called.  She was the homeowner, complaining
witness, in a case Mr. Mejia went to trial on February 16th, 2009, in Dallas on
Cause No. F0856627-Y in the Criminal District Court No. 7.  He was convicted
and given a 50-year sentence.

The trial court’s judgments state that the eight
sentences at issue shall commence “when the sentence imposed in Cause No.
F-0856627, in Dallas County, Texas, ceases to operate.”

          We conclude that appellant’s counsel’s admission
sufficiently linked him to the conviction for which the State sought cumulation,
and we overrule that part of his sixth point.  Id. at 262; see also
Mungaray v. State, 188 S.W.3d 178, 183–84 (Tex. Crim. App. 2006).

          Next,
appellant contends that cumulation was improper because the eight burglaries at
issue occurred in the same criminal episode as the Dallas County burglary.  Section
3.03 of the penal code limits the trial court’s discretion to cumulate
sentences.  See Tex. Penal Code Ann. § 3.03 (West Supp. 2011).  Under
that section, sentences must generally run concurrently when “the accused is
found guilty of more than one offense arising out of the same criminal episode prosecuted
in a single criminal action.”  Tex. Penal Code Ann. § 3.03(a) (emphasis
added); see Reese v. State, 305 S.W.3d 882, 885 (Tex. App.—Texarkana
2010, no pet.) (explaining that “single criminal action” refers to a single
trial or plea proceeding and that proper cumulation of sentences may occur for
offenses that are not tried in a single criminal action); see also Martin
v. State, No. 02-08-00128-CR, 2009 WL 2414294, at *8 (Tex. App.—Fort Worth
Aug. 6, 2009, no pet.) (mem. op., not designated for publication) (“[T]he trial
court did not err by failing to have the sentence from Martin’s DWI-misdemeanor
repetition conviction run concurrently with his conviction for failure to stop
and render aid because the two convictions were tried in separate criminal
actions.”).

          Even
if we were to hold that the eight burglaries at issue occurred in the same
criminal episode as the Dallas County burglary, because they were not tried in
the same criminal action as the Dallas County burglary, we conclude that
section 3.03(a) did not restrict the trial court’s discretion to cumulate.  See
Tex. Penal Code Ann. § 3.03(a); Reese, 305 S.W.3d at 885.

          For
these reasons, we overrule appellant’s sixth point.

Conclusion

          Having overruled each of
appellant’s points, we affirm the trial court’s judgments.

 

 

PER CURIAM

 

PANEL:  LIVINGSTON, C.J.; WALKER and MCCOY, JJ.

 

DO NOT PUBLISH

Tex. R. App.
P. 47.2(b)

 

DELIVERED: 
February 23, 2012









[1]See Tex. R. App. P. 47.4.





[2]See Tex. Penal Code
Ann. § 30.02(a)(1), (3) (West 2011).





[3]See Mejia v. State,
No. 05-09-00178-CR, 2010 WL 3212063, at *1 (Tex. App.—Dallas Aug. 16, 2010,
pet. ref’d) (not designated for publication).





[4]Appellant purports to
challenge the legal and factual sufficiency of the evidence.  But the court of
criminal appeals has held that there is no meaningful distinction between the legal
sufficiency standard and the factual sufficiency standard.  Brooks v. State,
323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (overruling Clewis v. State,
922 S.W.2d 126 (Tex. Crim. App. 1996)).  Thus, the Jackson standard is
the “only standard that a reviewing court should apply in determining whether
the evidence is sufficient to support each element of a criminal offense that
the State is required to prove beyond a reasonable doubt.”  Id. at 912.





[5]The absence of fingerprint
evidence is not dispositive of whether the evidence is sufficient to support
appellant’s convictions.  See Rascon v. State, 496 S.W.2d 99, 101 (Tex. Crim.
App. 1973) (discussing the absence of fingerprint evidence in circumstantial
cases); LaGrone v. State, 757 S.W.2d 893, 898 (Tex. App.—Beaumont 1988,
no pet.) (upholding a burglary conviction despite the absence of fingerprint
evidence).





[6]ListServ is a computer
network that police departments use to share information with each other.





[7]To the extent that
appellant argues that the trial court should have excluded evidence of
Sterett’s pretrial identification of appellant on the basis that the
identification was unreliable or coerced, we hold that appellant forfeited the
argument by failing to seek exclusion of the evidence on that ground at trial. 
See Tex. R. App. P. 33.1(a)(1); Perry v. State, 703 S.W.2d
668, 671 (Tex. Crim. App. 1986).





[8]The Dallas Court of
Appeals affirmed appellant’s conviction for burglarizing Cecil’s house.  See
Mejia, 2010 WL 3212063, at *5.





[9]When officers searched
room 3073, they did not find mail addressed to appellant and did not obtain
usable fingerprints.





[10]Although the police did
not locate any of Walker’s property in room 3073, Sterett said that he saw
appellant at Walker’s house on the date of that burglary, and Sterett also said
that he saw a car matching appellant’s Dodge Magnum on that day.





[11]Nonetheless, we note that
in an appropriate case, evidentiary sufficiency may be established by an
application of the law of parties under section 7.02 of the penal code even if
the jury charge did not contain an instruction about the law of parties.  See
Garza Vega v. State, 267 S.W.3d 912, 915 (Tex. Crim. App. 2008) (“If the
hypothetically correct jury charge for the case would authorize the jury to
convict on alternative theories of liability, then the appellate court must
deem the evidence sufficient if it is sufficient under any of the theories of
liability.”); Howard v. State, 966 S.W.2d 821, 825 (Tex. App.—Austin
1998, pet. ref’d).





[12]Earlier in the trial,
appellant had objected to testimony about the officers’ consent to search room
3073 because of his desire to confront Young about whether she had given consent. 
The trial court granted appellant a running objection on his confrontation
complaint as related to the validity of the search, but appellant did not
secure a running objection concerning any statements that Young might have made
about appellant’s connection to room 3073.





[13]See Weems v. State,
167 S.W.3d 350, 358 (Tex. App.—Houston [14th Dist.] 2005, pet. ref’d), cert.
denied, 547 U.S. 1135 (2006).





[14]Neither probable cause
nor reasonable suspicion are generally necessary to authorize surveillance.  Metoyer
v. State, 860 S.W.2d 673, 678 (Tex. App.—Fort Worth 1993, pet. ref’d).





[15]We will broadly construe
appellant’s relevance objection as an argument that the extraneous offense was
not admissible under rule 404(b). 





[16]In his brief, appellant
relies on a court of criminal appeals opinion that concerned using extraneous
offenses to show a common plan or scheme but did not discuss using them to
prove a defendant’s identity as the perpetrator of a charged offense.  See
Daggett v. State, 187 S.W.3d 444, 451–52 (Tex. Crim. App. 2005).  Because
we hold that Cecil’s burglary was admissible to prove identity, we need not
discuss how Daggett would have affected the admissibility of Cecil’s
burglary to prove a common plan.